**Brian LANTER, Appellant,**

v.

**KENTUCKY STATE POLICE; Hon. J. Kevin King, Administrative Law Judge; and Workers' Compensation Board, Appellees.**

No. 2004–SC–0872–WC.

Supreme Court of Kentucky.

Aug. 25, 2005.

As Corrected Aug. 29, 2005.

Gregory N. Schabell, Busald, Funk & Zevely, PSC, Florence, KY, Counsel for Appellant.

Kenneth Lance Lucas, Edgewood, KY, Counsel for Appellee.

Chapter 13 of the AMA *Guides to the Evaluation of Permanent Impairment* (*Guides*) addresses disorders of the central and peripheral nervous system; Chapter 14 addresses mental and behavioral disorders. The claimant alleged that work-related head trauma caused impairments under both chapters that, together, rendered him totally disabled. Nonetheless, an Administrative Law Judge (ALJ) awarded income benefits for only partial disability and determined that an impairment that was assigned under Chapter 13 most nearly measured the claimant's abili-

ty to perform activities of daily living with the need for some direction. Rejecting the claimant's assertion that uncontroverted evidence of a psychiatric impairment compelled a Chapter 14 impairment to be included in his disability rating, the Workers' Compensation Board (Board) and the Court of Appeals affirmed. We affirm.

On April 5, 2002, the claimant was struck in the head while participating in a training class in defensive tactics at the Kentucky State Police Academy. He later testified that he had six years of martial arts training that involved physical contact and that he had used that training previously to defend himself from an assault. He stated that he had been mentally prepared for the training exercise and had not been afraid. As he recalled the incident, he was struck in the head and became dazed. He was then hit several more times and became unconscious. Upon regaining consciousness, he was kicked while struggling to his feet. When he attempted to leave the room, he had his head slammed into the wall. He was told to return to class after the incident but refused, became dizzy, and fell down again. He was then interviewed in the captain's office, resigned from the academy, and drove home, almost wrecking several times.

Ten days later, after experiencing neck pain, memory loss, and clumsiness, as well as difficulty walking, speaking and driving, the claimant first sought treatment from his family physician, Dr. Shearer. In addition to a neck injury that is no longer at issue, his application for workers' compensation benefits alleged a severe brain contusion and concussion as well as post-traumatic stress disorder, severe generalized anxiety disorder, and psychosis due to the head injury. At issue presently is whether the medical evidence compelled a finding that harmful changes resulting from the head trauma warranted a disability rating based upon impairments under both Chapter 13 and 14 of the *Guides.*

A December, 2002, report from Dr. Shearer stated that he began treating the claimant on April 15, 2002, for neck pain and for memory loss and other cognitive complaints after he was struck in the head several times by an instructor. Dr. Shearer diagnosed cognitive brain dysfunction and cervical stenosis. Using the Fifth Edition of the *Guides,* he assigned a 30% impairment based on Chapter 13, Table 13–3 (Impairment Due to Episodic Loss of Consciousness or Awareness).

A November, 2002, report from Dr. D'Souza, the claimant's treating psychiatrist, noted that the claimant was frightened, confused, and experienced severe headaches after the head trauma and period of unconsciousness. Since then, he had also been experiencing nightmares, difficulty sleeping, and severe depressive symptoms as well as anxiety, panic attacks, paranoid thoughts, and active flashbacks. He was currently engaged in extensive psychotherapy and receiving pharmacotherapy. Dr. D'Souza diagnosed post-traumatic stress disorder, major depressive episodes with psychotic features, post-concussion syndrome, and psychosis due to head trauma. He attributed the conditions to a focal brain lesion that was caused by the head injury. In his opinion, the claimant did not retain the physical capacity to return to the type of work performed at the time of the injury. Such work would exacerbate his symptoms and make him more disabled. He should avoid stressful situations in any kind of work.

Dr. Pagani, who is board-certified in neurology and emergency medicine, treated the claimant several times between April 18 and October 17, 2002. His December, 2002, report noted the history of

injury followed by symptoms that included headache, confusion, disorientation, loss of memory, hypersomnia, and psychomotor retardation. He noted that the medications Dr. D'Souza prescribed had helped. After performing various diagnostic tests, including a brain MRI, EEG, and brain SPECT, Dr. Pagani diagnosed a cerebral contusion with post-concussive syndrome. He attributed the claimant's present condition to the head trauma and assigned a 14% impairment to the central nervous system, using Table 13–6 (Impairment Related to Mental Status) from Chapter 13 of the *Guides*. He stated that the claimant did not have an active impairment before the injury or a pre-existing dormant condition that was aroused by the injury. In his opinion, the claimant lacked the physical capacity to return to the type of work he performed at the time of the injury. Furthermore, he should avoid stressful situations and independent or unsupervised work.

The employer submitted a report based on a June 11–12, 2003, neuropsychiatric evaluation by Dr. Granacher, who is board-certified in both neurology and psychiatry. Dr. Granacher obtained a detailed history and performed both physical and mental status examinations. He ordered extensive neuropsychological, intellectual, achievement, and personality testing. He also ordered a SPECT scan, which revealed functional defects in the right parietal and left occipital lobes of the claimant's brain.

Noting that Dr. D'Souza thought the claimant was psychotic but that the claimant denied ever hearing voices, seeing things, or being delusional, Dr. Granacher stated that he could not determine the basis for the diagnosis. He noted that Dr. D'Souza had prescribed Seroquel and Trileptal for a while but that the claimant had not been on them for some time and was taking no "psychiatric or brain medications" presently. Summarizing the mental status examination, he noted that the claimant was pleasant and cooperative; that he independently completed a complex 23–page medical questionnaire; that he was oriented to person, place, and time; and that he was a capable historian. His affective range was moderately constricted, but he made good eye contact, had no delusions or hallucinations, and had no loose associations or circumstantial thinking. He denied suicidal ideas or plans and never appeared tearful or anxious.

Dr. Granacher noted that there was no sign of "faking bad" on the cognitive portions of the testing and concluded that it was valid. He stated, however, that when taking the MMPI–2, which measures psychological adjustment, the claimant may have attempted "to create a highly virtuous self-portrait, in conjunction with elevated clinical scales that indicate a claim of serious physical and emotional disability." Therefore, Dr. Granacher thought that the claimant's MMPI–2 profile "may not accurately represent existing psychopathology." Later in the report, he explained that the test was administered "to provide hypotheses" regarding the claimant's psychological functioning but that its validity in individuals with traumatic brain injury had not been verified. Therefore, the standard interpretations may not apply to such individuals, and "[t]he interpretations presented in this report need to be verified by other sources of clinical information."

Dr. Granacher determined that the claimant's cognitive functioning was average before the injury but that it had declined in several areas due to the head trauma and that the brain lesions that were noted on the SPECT scan appeared to be permanent. Using the DSM–IV–TR classification system for mental disorders, he diagnosed a cognitive disorder due to

head trauma (Axis I), no personality or developmental disorder (Axis II), a cognitive disorder (Axis III), no psychosocial stressors (Axis IV), and a current GAF of 65 (Axis V). He concluded that the claimant had a 14% neuropsychiatric impairment due to head trauma, relying on Tables 13–5 (Clinical Dementia Rating) and 13–6 (Impairment Related to Mental Status) from page 320 of the Fifth Edition of the *Guides*.

Michael Borack, a Doctor of Psychology and practicing clinical psychologist, evaluated the claimant on May 6, 2003. His July 3, 2003, report indicated that he reviewed the other medical reports and diagnostic test results, including the neuropsychological, academic/achievement, intellectual capacity, personality, and brain imaging tests. He disagreed with Dr. Granacher's conclusion regarding the validity of the MMPI–2 personality assessment. Dr. Borack acknowledged that there were no norms specific to individuals who have sustained a head injury. Nonetheless, he thought that the claimant's effort to "fake good" and, thereby, to minimize any psychological disturbances suggested that the clinical scale findings were highly meaningful. They revealed "significant sadness and depressed mood, suspiciousness and hostile sensitivity, anxiety and agitation, interpersonal alienation, and difficulties in logic and concentration." Dr. Borack diagnosed posttraumatic stress disorder and dementia due to head trauma with a clinically significant behavioral disturbance. Taking into account the degree of impairment in the claimant's ability to perform activities of daily living and in his social functioning, concentration, and adaptation, Dr. Borack concluded that he came within the criteria for a Class 3 (moderate) impairment of 47.5%.

When deposed in May, 2003, the claimant stated that he was living with his parents and attending college. He explained that he decided to become a fitness trainer after his injury and began taking three classes but later dropped two of them due to post-traumatic stress, panic attacks, and seizures. He stated that he had not attempted to find work and had not been released to do so by his doctor. He stated that he continued to experience memory loss, clumsiness, difficulty walking, difficulty speaking, and forgetfulness. In July, 2003, at the hearing, he testified that he was on summer break but was scheduled to return to school in the fall. He stated that he had experienced difficulty with the physical activities in his previous classes and sometimes passed out. He had problems with long term and short term memory, became physically and mentally exhausted, and had difficulty understanding the material. He testified that he no longer took medication for the effects of his injury and noticed no change in his condition. He had not seen Drs. Pagani or D'Souza for a few months and had no scheduled medical appointments. On a typical day, he did physical therapy and researched his brain injury on the internet.

After summarizing the lay and medical evidence, the ALJ stated as follows:

From a psychological perspective, four physicians have rendered opinions regarding Lanter's impairment. Dr. Shearer assigned Lanter a 30% impairment, Dr. Granacher and Dr. Pagani assigned Lanter a 14% impairment, and Dr. Borack assigned Lanter a 47.5% impairment.

Having reviewed the evidence and the appropriate portions of the *AMA Guides*, the [ALJ] notes that Dr. Shearer's impairment would require Lanter to suffer from severe episodic loss of con-

sciousness or awareness to the point that Lanter's activities would need to be supervised, protected, or restricted. While it is clear that Lanter does have some occasional loss of awareness, it is not to the extent necessary to support Dr. Shearer's impairment rating. Dr. Borack's impairment is based on mental and behavioral disorders. To qualify for the high-end of a Class 3 impairment, Lanter must have impairment levels compatible with some but not all useful functioning rising nearly to the level of significant difficulties with useful functioning. Furthermore, the *Guides* state on page 364 that, "a moderate impairment does not imply a 50% limitation in useful functioning, and an estimate of moderate impairment in all four categories does not imply a 50% impairment of the whole person." On the other hand, the impairment ratings of Dr. Pagani and Dr. Granacher more nearly indicate Lanter's ability to perform activities of daily living and the need for some direction. Therefore, the [ALJ] finds that Lanter has a 14% impairment from a psychological standpoint.

Taking into account the claimant's difficulty performing classwork due to his mental and physical restrictions but also his age (25), education (two years of college), history of sedentary to medium work, and his ability to drive, to research his condition on the internet, and to perform the majority of his activities of daily living, the ALJ determined that he was capable of some type of work.

■ The claimant maintains that his head injury caused both brain damage and a psychological condition. Pointing to the ALJ's references to a psychological injury while relying on a neurological impairment, he maintains that the ALJ "overlapped and misinterpreted" Chapters 13 and 14 of the *Guides,* considered only the first condition, and disregarded the second. He asserts that only Drs. Borack and D'Souza testified regarding a psychological condition and that only Dr. Borack analyzed the impairment the condition caused. Therefore, the ALJ was required to accept Dr. Borack's uncontradicted testimony that the condition caused a 47.5% impairment. We disagree.

Chapter 13 of the *Guides* provides criteria for evaluating brain dysfunction, emphasizing the deficits or impairments that may be identified during a neurologic evaluation. *Id.* at 305. It acknowledges, however, that "[b]ecause neurologic impairments are intimately related to mental and emotional processes and their functioning, the examiner should also understand Chapters 14, Mental and Behavioral Disorders, and 18, Pain" and that "[a]dditional impairments based on those chapters *may* need to be considered." (emphasis added). *Id.* at 306; *see also Id.* at 321–22. Section 13.3f (Emotional and Behavioral Impairments) of Chapter 13 contains Table 13–8, which sets forth the criteria for rating such impairment.[1] Furthermore, Section 13.3f states that "[e]motional, mood, and behavioral disturbances illustrate the relationship between neurology and psychiatry. *Emotional disturbances originating in verifiable neurologic impairments (e.g., stroke, head injury) are assessed using the criteria in this chapter.*" (emphasis added). *Id.* at 325. Some of the psychiatric fea-

---

1. The criteria are as follows: Class 1 (0–14%), Mild limitation of activities of daily living and daily social and interpersonal functioning; Class 2 (15–29%), Moderate limitation of some activities of daily living and some daily social and interpersonal functioning; Class 3 (30–69%), Severe limitation in performing most activities of daily living, impeding useful action in most daily social and interpersonal functioning; and Class 4 (70–90%), Severe limitation of all daily activities, requiring total dependence on another person.

tures listed as examples include irritability, outbursts of rage or panic, aggression, withdrawal, depression, mania, and emotional fluctuations. Section 13.3f also states that "[n]eurologic impairments producing psychiatric conditions are assessed using the neurologic examination, with an expanded neuropsychiatric history and the necessary ancillary tests." *Id.*

The introduction to Chapter 14 of the *Guides*, states, in part, as follows:

> This chapter discusses impairments due to mental disorders and considers behavioral impairment of function that may complicate any condition. As did Chapter 13 (The Central and Peripheral Nervous System), this chapter assesses the brain; however, here the emphasis is on evaluating brain function and its effect on behavior for mental disorders. Unlike the other chapters in the *Guides*, this chapter focuses more on the *process* of performing mental and behavioral impairment assessment. Numerical impairment ratings are not included; however, instructions are given for how to assess an individual's abilities to perform activities of daily living. (emphasis original).

*Id.* at 357–58. The introduction also notes that the Fifth Edition stresses the importance of the DSM–IV criteria for determining a mental impairment and includes more case examples to exemplify the relationship between diagnosis, symptoms, and impact on the ability to perform activities of daily living. Current research finds little relationship between psychiatric signs and symptoms and the ability to perform competitive work. *Id.* at 361–62. Evaluating impairment is based on the extent of function in four main categories: 1.) ability to perform activities of daily living; 2.) social functioning; 3.) concentration, persistence, and pace, which relate to the ability to sustain focused attention long enough to permit the timely completion of necessary tasks; and 4.) ability to adapt to stressful circumstances without deterioration or decompensation. Chapter 14 describes a Class 2 impairment as being mild, which "implies that any discerned impairment is compatible with most useful social functioning." *Id.* at 363. It describes a Class 3 impairment as being moderate, which "means that the identified impairments are compatible with some, but not all useful functioning." *Id.* Chapter 14 does not assign percentages to impairments, but as the ALJ noted when analyzing the evidence, it does state that "a moderate impairment does not imply a 50% limitation in useful functioning, and an estimate of moderate impairment in all four categories does not imply a 50% impairment of the whole person." *Id.* at 364.

 Workers' compensation law is fundamentally for the benefit of the injured worker. *See Messer v. Drees*, 382 S.W.2d 209 (Ky.1964). Nonetheless, an injured worker has the burden to prove every element of a claim for benefits, one of which is the amount of AMA impairment that it caused. *See* KRS 342.0011(11); KRS 342.730(1)(b); *Roark v. Alva Coal Corporation*, 371 S.W.2d 856 (Ky.1963); *Wolf Creek Collieries v. Crum*, 673 S.W.2d 735 (Ky.App.1984); *Snawder v. Stice*, 576 S.W.2d 276 (Ky.App.1979). KRS 342.285 designates the ALJ as the finder of fact; therefore, the courts have determined that the ALJ, rather than the Board or a reviewing court, has the sole discretion to determine the quality, character, and substance of evidence. *See Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418 (Ky.1985). When the party with the burden of proof does not succeed before the ALJ, that party's burden on appeal is to show that the favorable evidence was so compelling that the decision to the contrary was unreasonable. *Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky.1986).

Depending on the evidence, a claim of psychological harm from a traumatic brain injury could be raised under either of two theories: 1.) that the emotional effects of having sustained such an injury resulted in behavioral symptoms; or 2.) that the brain damage caused by the injury resulted in both neurological and behavioral symptoms. No medical expert attributed the claimant's behavioral symptoms to the emotional effects of the training incident or of living with the harm that it caused. At issue, therefore, is whether the evidence compelled the ALJ to award benefits for the effects of the claimant's brain damage based not only on his impairment under Chapter 13 but also on an impairment under Chapter 14.

The proper interpretation of the *Guides* and the proper assessment of impairment are medical questions. *See Kentucky River Enterprises, Inc. v. Elkins,* Ky., 107 S.W.3d 206, 210 (Ky.2003). In the present case, no physician testified regarding the proper application of the *Guides* when evaluating impairment from a traumatic brain injury that causes both neurological and behavioral symptoms. Faced with impairment ratings that were assigned under Chapters 13 and 14 and the task of selecting an impairment rating that was a reasonable estimation of the claimant's condition, the ALJ appropriately consulted the *Guides* when considering the medical evidence and deciding upon which experts to rely. Chapter 13 clearly indicates that an additional impairment may be warranted in certain instances based on behavioral factors that originate in the brain due to organic damage from a head injury, but it does not indicate that behavioral symptoms always warrant an additional impairment. Furthermore, it appears to indicate that any additional impairment for emotional or behavioral disorders is to be determined under the criteria found in Section 13.3f of Chapter 13 rather than under Chapter 14. *Id.* at 325.

We find nothing in the ALJ's reference to the impairment "from a psychological standpoint" or "psychological perspective" together with a discussion of impairments that were assigned under Chapters 13 and 14 of the *Guides* that evinces a misunderstanding of the medical evidence or a confusion regarding Chapters 13 and 14. In summarizing the evidence, the ALJ specifically noted that the claimant was no longer taking any medication for the neurological or behavioral effects of his injury and had no scheduled medical appointments. It is apparent from the analysis that followed that the ALJ found the impairments assigned by Drs. Shearer and Borack to be excessive in light of the claimant's restrictions and found the impairments assigned by Drs. Pagani and Granacher to "more nearly indicate [the claimant's] ability to perform activities of daily living and the need for some direction." The decision was reasonable under the evidence that was available and was properly affirmed on appeal. *Special Fund v. Francis, supra.*

LAMBERT, C.J., and COOPER, JOHNSTONE, ROACH, SCOTT, and WINTERSHEIMER, JJ., concur.

GRAVES, J., dissents and states that when the ALJ "noted in particular Lanter's young age", he gave undue weight to youth and erroneously assumed Lanter would outgrow his disability.