# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

# Supreme Court of Kentucky

## 2018-SC-000543-WC

ORMSCO, INC.                                                               APPELLANT

ON APPEAL FROM COURT OF APPEALS
V.                          CASE NO. 2017-CA-001227-WC
WORKERS' COMPENSATION BOARD NO. 14-WC-91750

GARY BLACKBURN; DR. ERIN GREER,                              APPELLEES
KENTUCKY ONE HEALTH-PCA; HON.
JOHN B. COLEMAN, ADMINISTRATIVE
LAW JUDGE; AND WORKERS'
COMPENSATION BOARD

**MEMORANDUM OPINION OF THE COURT**

**REVERSING AND REMANDING**

Ormsco, Inc., appeals from the Court of Appeals' decision upholding an

Administrative Law Judge's (ALJ) award of 13% permanent partial disability

benefits to Gary Blackburn because of a work-related injury. Ultimately,

Ormsco argues that the ALJ erred by making findings not supported by

substantial evidence. Because Kentucky law requires that a permanent

impairment rating be determined pursuant to the fifth edition of the American

Medical Association's *Guides to the Evaluation of Permanent Impairment*

*(Guides)*, we agree with Ormsco. For the reasons stated below, we reverse the

Court of Appeals, reinstate the Board's opinion and remand to the ALJ for findings consistent with this Opinion.

## FACTS AND PROCEDURAL HISTORY

Gary Blackburn was hired by Ormsco, Inc., an equipment rental business, in 2009 to repair lawn mowers, chainsaws, small engines, weed eaters, and other equipment. His job required a certain degree of physical ability because he was required to load and unload the equipment he repaired. On March 7, 2014, a trailer Blackburn was using to retrieve a lawn mower became stuck. As he attempted to free it, he experienced a pop followed by pain in his back. His boss met him at the scene of the incident and thereafter Blackburn sought treatment at the emergency room. When he arrived, he complained of pain in the middle of his back above the belt line, along with tingling and numbness in his left leg and toes. He was diagnosed with an L3 compression fracture, back pain and hypertension.

The next day, Dr. Jean-Maurice Page performed a kyphoplasty to repair the compression fracture at L3.[1] Prior to surgery, Dr. Page noted that x-rays revealed an acute burst fracture with a 50% loss of height. In his operative note, Dr. Page indicated the surgery was successful and he was able to reduce the compression fracture by almost 90%. Dr. Page released Blackburn to

---

[1] A kyphoplasty is a procedure for stabilizing compression fractures that "uses special balloons to create spaces within the vertebra that are then filled with bone cement." It can "correct spinal deformity and restore lost height." *Vertebroplasty*, MAYO CLINIC (December 28, 2017) https://www.mayoclinic.org/tests-procedures/vertebroplasty/about/pac-20385207.

2

return to regular work on June 24, 2014, with the restriction of wearing a back brace. Blackburn testified that he wore the brace, and avoided lifting over 25 pounds, but he continued to experience back pain. He was able to work without restriction in the fall of 2014. From the date of his return through March 18, 2016, Blackburn received a greater average weekly wage than before his injury.

Blackburn visited Dr. Page several times after the surgery. On April 22, 2014, Dr. Page examined Blackburn and stated that the x-rays of the lumbar spine revealed a stable appearance of the kyphoplasty. On May 20, 2014, Dr. Page again stated that multiple views of the lumbar spine revealed that as a result of the L3 kyphoplasty "excellent height was achieved." Dr. Page's impression in the May 20 report was that the outcome from the kyphoplasty was good. These same notes were recorded in the report from Dr. Page's June 24, 2014 examination. On September 18, 2014, Dr. Page indicated that Blackburn had full mobility of the lumbar spine and that normal disc height was observed.

Blackburn subsequently claimed he exacerbated his condition on June 12, 2015 when he was jolted while operating a bobcat at work. Blackburn initiated a workers' compensation claim on November 16, 2015. Initially, only the March 7, 2014 injury was included but Blackburn later amended his claim to include the alleged exacerbation of the injury that occurred on June 12, 2015. On July 15, 2016, he received a termination letter from Ormsco which stated that the company could no longer accommodate his restrictions, citing

to the full duty work release from Dr. Page and an independent medical examination by Dr. Timothy Kriss.

Dr. Arthur Hughes had previously evaluated Blackburn on December 15, 2015, and assessed a 13% whole person impairment for the burst fracture at L3 with 50% loss of height. Dr. Hughes noted that Blackburn complained of persistent low back and left leg pain and so the physician would restrict him to a job that allowed him to stand or sit as needed with only light lifting and no twisting of the back. Dr. Hughes stated that Blackburn was not at maximum medical improvement (MMI) but could be considered as such if he had no additional treatment.

Dr. Timothy Kriss evaluated Blackburn on December 23, 2015. He took a history of the injury and noted his opinion, from reviewing the medical records, that the original compression fracture only resulted in a 20% loss of height. He opined that the kyphoplasty was successful, leaving only minimal residual compression, and noted that an MRI conducted in October 2015 was normal.[2] The October 2015 MRI and report referenced by Dr. Kriss, and other physicians, noted "no acute compression fractures or significant degenerative changes," also stating that it was an "unremarkable" MRI. He believed that Blackburn was engaging in symptom exaggeration, stating that Blackburn's behavior seemed so extreme that it was difficult to convey in writing. Dr. Kriss

---

[2] Dr. Kriss's report states that he personally reviewed both the March 7, 2014 and October 23, 2015 CT and MRI scans, whereas Dr. Hughes only reviewed radiology reports written by other physicians who reviewed scans, not the scans themselves.

4

placed Blackburn in Diagnosis Related Estimate (DRE) lumbar category II,[3] rating him with a 5% whole person impairment and stating that he saw no need for permanent restrictions.[4]

Dr. Kriss opined that Blackburn reached MMI on October 2, 2014, when he was discharged from all orthopedic and spinal care. He also stated that this time frame was consistent with Blackburn's history and reports, highlighting things such as his return to work with minimal restrictions in June 2014, the full mobility of the lumbar spine noted on September 18, 2014, and that Blackburn only experienced back pain while lifting as of September 18, 2014.

On January 7, 2016, Blackburn saw Dr. Gregory D'Angelo for continuing left leg and hip pain. He noted that although Blackburn had radicular-type symptoms, his MRIs did not substantiate radiculopathy. He stated that Blackburn needed to be evaluated for the SI (sacroiliac) joint but did not see anything in regard to his hip other than some arthritis.

---

[3] For lumbar spine injuries, the *Guides* include five categories of lumbar impairment based on individual patient history, clinical studies, and symptoms. *Guides* at 384.

[4] Dr. Kriss stated numerous reasons for placing Blackburn in DRE lumbar category II, including: (1) the compression fracture was limited to the anterior vertebral body only; (2) Dr. Page achieved close to 100% reduction of the mild fracture with the kyphoplasty; (3) absence of any comminution (splintering/shattering) of the fracture on the original CT scan; (4) absence of any retropulsion (5) normal alignment; (6) absence of stenosis or neurological compression (7) absence of neurological symptoms; (8) normal neurological exam at every medical evaluation; (9) complete resolution of pain documented by Dr. Page and Dr. Hashmi, who was one of Blackburn's doctors in the emergency room and who also created the discharge summary on March 9, 2014, and (10) Blackburn's choice to remodel his home in November 2014 in addition to working full-time, full duty.

Dr. Hughes was deposed on March 2, 2016, and revealed that he based his impairment rating on Dr. Page's report reflecting the compression fracture being at 50% prior to surgery as shown in an x-ray. The attorney questioning Dr. Hughes noted that the *Guides* allow categorizing an impairment in DRE lumbar category III when a *healed* compression fracture has a remaining compression that is 25-50%, and Dr. Hughes agreed and stated his opinion that it takes six weeks for a compression fracture to heal. (Emphasis added). Dr. Hughes did not order any x-rays and did not have any diagnostic films for his review as part of the examination. He admitted that Dr. Page's note about the 50% loss in height was the only reference in the entire record available to him about the extent of the fracture. Additionally, he stated that an examiner would need an actual x-ray to measure the current degree of compression after a fracture heals.

Dr. Matthew Tutt examined Blackburn on May 19, 2016, and reviewed the October 2015 MRI. Dr. Tutt stated that the MRI was underwhelming, and that Blackburn's reported symptoms were completely out of proportion to what he observed in the MRI. After performing a new MRI, Dr. Tutt examined Blackburn again on August 15, 2016, and reported a probable compression fracture at L4, but that "vertebral body heights are normal." The MRI also indicated that the kyphoplasty at L3 had no complication and no instability. Dr. Tutt further indicated that while he was unsure whether the new L4 fracture was related to the previous L3 kyphoplasty, he "prefer[red] to think not," due to the placement of the kyphoplasty cement.

6

Blackburn also filed the medical report of Dr. Steven Autry who examined him on November 9, 2016. Dr. Autry took a history of Blackburn's injuries and subsequent treatment, and also reviewed the diagnostic studies. Dr. Autry believed Blackburn also had a lumbar fracture at L4. He placed Blackburn in DRE lumbar category III for having fractures at L3 and L4 with greater than 25% loss of height. He assessed a 13% impairment for the compression fractures at L3 and L4, but notably he did not specify the percentage attributable to each level. Additionally, Dr. Autry assessed a 7% impairment for Blackburn's right rotator cuff, which he believed was associated with Blackburn's use of crutches while dragging his foot.[5]

The ALJ conducted a hearing on December 7, 2016. After reviewing the evidence, on February 1, 2017, the ALJ determined that Blackburn retained a 13% whole person impairment as a result of the L3 compression fracture. The ALJ stated that the June 12, 2015 injury was not a new injury but instead was an exacerbation of Blackburn's condition. The ALJ also applied the 2x multiplier pursuant to Kentucky Revised Statute (KRS) 342.740(1)(c)(2) because Blackburn was terminated due to continuing difficulties at work which could no longer be accommodated. The order also states that Ormsco is required to pay all reasonable and necessary medical expenses for the cure and

---

[5] We note that Dr. Autry's report states that Blackburn has a 13% whole person impairment for "lumbar vertical fracture L3, L4 . . ." and a 7% whole person impairment for right rotator cuff tendinosis and impingement. In the next section titled "combination of values" Dr. Autry lists 19%. It is unclear where the typo occurred, since adding 13% and 7% equals 20%, not the 19% listed as the combination of values.

7

relief of the L3 compression fracture, but not for expenses associated with Blackburn's left hip and rotator cuff.

The ALJ noted that the point of contention between the parties was whether the fracture resulted in a 20% or a 50% loss of height. The ALJ found that Dr. Page "was by far in the best position to determine the loss of height as he performed the surgical repair" and that Dr. Page had more credibility on the issue. The ALJ recognized that after the kyphoplasty and healing, Blackburn's 50% loss of height was significantly reduced and he relied on an example contained in the *Guides*. The example involved a burst fracture with a 55% loss of height that was treated with bracing and healed to a 60% loss of height. In the example there is no mention of surgical treatment. The ALJ stated that this example did not indicate whether the measurement was taken after treatment and assessed the 13% impairment in accordance with the opinions of Dr. Hughes and Dr. Autry.

Ormsco filed a petition for reconsideration stating that it was error for the ALJ to base the award on the degree of compression fracture found on the date of the injury, rather than when MMI was reached. Additionally, Ormsco noted that the ALJ did not note whether the newfound compression fracture at L4 as reported by Dr. Tutt was work-related. Upon reconsideration, the ALJ stated that the *Guides* clearly reveal that the degree of the compression fracture is the basis for the plaintiff being placed into a DRE lumbar category. Additionally, two physicians placed Blackburn in DRE lumbar category III and those opinions were supported by treating physician records. As to the L4

fracture, the ALJ agreed with Ormsco that there was a lack of proof that the newly-discovered fracture was related to the original work injury and relieved Ormsco of the responsibility of paying the medical expenses associated with the L4 fracture.

Ormsco appealed the ALJ's decision and on June 30, 2017, the Workers' Compensation Board (Board) remanded the claim to the ALJ for additional findings of fact and entry of an amended opinion. The Board vacated the ALJ's award of permanent partial disability benefits because the medical evaluations the ALJ relied on did not comport with the *Guides*, which state that an individual with a spinal condition should be rated for impairment once MMI has been reached. Since the ALJ relied on Dr. Hughes, who rated Blackburn's impairment based on an x-ray taken before his surgery, and on Dr. Autry, who evaluated Blackburn after the L4 fracture that was determined to be non-work-related, no substantial evidence supported the ALJ's award. While Blackburn indisputably sustained a compensable injury to his L3 vertebra, any award for permanent partial disability benefits "must be based upon Blackburn's condition when he reached MMI, and must not include any assessment for the unrelated L4 condition."

Blackburn appealed the Board's decision to the Court of Appeals. The Court of Appeals held that the Board misconstrued controlling authority and flagrantly erred in evaluating the evidence. The Court of Appeals stated that the Board criticized the ALJ's reliance on Dr. Hughes's evaluation because he assessed Blackburn's impairment prior to the surgery, but Dr. Kriss employed

9

the same methods. Noting that it is within the ALJ's discretion to rely on one evaluation over another, the Court of Appeals concluded that the Board effectively substituted its judgment for that of the ALJ, which is improper.

Ormsco appealed to this Court, arguing that, as a matter of law, the ALJ failed to follow the *Guides* in assessing Blackburn's impairment. More specifically, Ormsco argues that the ALJ erred in relying on impairment ratings that were assessed based on signs and symptoms as they existed prior to surgery and thus prior to MMI. Because Kentucky mandates the use of the *Guides* in assessing the impairment rating used in calculating permanent partial disability benefits, we agree with Ormsco.

## ANALYSIS

The sole issue is whether substantial evidence supported the impairment rating assigned to Blackburn for use in calculating the permanent partial disability award. "The proper interpretation of the *Guides* and the proper assessment of impairment are medical questions." *Lanter v. Ky. State Police,* 171 S.W.3d 45, 52 (Ky. 2005). However, the ALJ has discretion to choose the rating used as the basis for an award of permanent partial disability benefits. *Pella Corp. v. Bernstein,* 336 S.W.3d 451, 453 (Ky. 2011). KRS 342.730(1)(b) governs the calculation of permanent partial disability benefits which includes "the permanent impairment rating caused by the injury or occupational disease as determined by the 'Guides to the Evaluation of Permanent Impairment.'" KRS 342.0011(37) specifies that Kentucky uses the fifth edition of the *Guides.* While the ALJ has discretion in determining which medical evidence is most

10

persuasive, *Kentucky River Enters. v. Elkins*, 107 S.W.3d 206, 210 (Ky. 2003), the ALJ is constrained by KRS 342.730(1)(b) which requires an impairment rating to be determined by the *Guides*.

On appellate review, this Court must determine whether substantial evidence of probative value supports the ALJ's findings. *Whittaker v. Rowland*, 998 S.W.2d 479, 481-82 (Ky. 1999). Substantial evidence is evidence of "substance and relevant consequence" having fitness to induce conviction in the minds of reasonable people. *Miller v. Tema Isenmann, Inc.*, 542 S.W.3d 265, 270 (Ky. 2018). In awarding benefits, the ALJ relied on the medical opinions of Dr. Hughes and Dr. Autry. Ormsco argues that Dr. Autry's assessment cannot constitute substantial medical evidence because Dr. Autry assessed a combined impairment for the injuries at L3 and L4. The ALJ determined upon reconsideration that there was insufficient proof that the L4 fracture was related to the original work injury. Based on Dr. Autry's evaluation and report, it is unclear which part of his 13% whole person impairment rating is a result of the L3 fracture and which part results from the newly-discovered L4 fracture. Because Dr. Autry did not apportion the impairment between L3 and L4, his assessment cannot constitute substantial evidence. We agree that because Dr. Autry's impairment rating does not apportion impairment between L3 and L4, and because the ALJ ordered on reconsideration that Ormsco is not responsible for the medical expenses associated with the L4 injury, that Dr. Autry's impairment rating cannot support an award of benefits for the L3 injury standing alone.

11

Ormsco also argues that Dr. Hughes's opinion regarding impairment cannot constitute substantial evidence since his assessment was based upon an x-ray taken prior to Blackburn's surgery, and he did not review any testing subsequent to the surgery or subsequent to Blackburn reaching MMI. We agree.

In this case, the physicians evaluated Blackburn using the DRE method, which stands for diagnosis related estimate, and is the principal method used to evaluate individuals like Blackburn who have a distinct injury. *Guides* at 379. When determining the appropriate DRE category, the *Guides* state *"[t]he impairment rating is based on the condition once MMI is reached, not on prior symptoms or signs." Id.* at 383 (emphasis in original). The *Guides* include a chart outlining the spine evaluation process and the first step asks whether the individual is at MMI. *Guides* at 380. If yes, the evaluator is instructed to proceed to the next step, which is determining whether the impairment is due to injury or illness. If the individual has not reached MMI, the chart instructs the evaluator to "[a]wait MMI." *Id.* Further, the introduction to the section on spinal injuries states that "an individual with a spinal condition is rated only when the condition is stable (unlikely to change within the next year regardless of treatment), *i.e.*, when MMI has been reached." *Guides* at 374.

Additional sections of the *Guides* further support the Board's opinion that the ALJ erred in relying on Dr. Hughes and Dr. Autry. In Chapter 1, the *Guides* state "[a]n impairment is considered permanent when it has reached **maximal medical improvement (MMI),** meaning it is well stabilized and

12

unlikely to change substantially in the next year with or without medical treatment." *Guides* at 2 (emphasis in original). MMI is defined as "[a] condition or state that is well stabilized and unlikely to change substantially in the next year, with or without medical treatment. Over time, there may be some change; however, further recovery or deterioration is not anticipated." *Guides* at 601.

Additionally, as the Board stated, "[i]t is apparent the impairment rating adopted by the ALJ in this case is based upon Blackburn's condition both prior to reaching MMI, and in fact prior to undergoing kyphoplasty surgery . . . ." Dr. Hughes placed Blackburn in DRE lumbar category III due to the burst fracture at L3 with a 50% loss of height. He also opined that Blackburn had not yet reached MMI, unless no further treatment was approved. In his deposition he stated that he relied on Dr. Page's consultation report from March 8, 2014, which was based on an x-ray conducted before the surgery was performed. The consultation occurred on March 8, 2014, and happened before Blackburn's surgery, because the report goes on to say that Dr. Page's plan is to perform the kyphoplasty and that consent will be obtained. During the deposition Dr. Hughes admitted that the note regarding 50% loss of height is based on observations before Blackburn's surgery.

The attorney deposing Dr. Hughes highlighted that the *Guides* allow categorization in DRE lumbar category III when a healed compression fracture has a remaining compression between 25 to 50% and Dr. Hughes affirmed this principle. Further, when asked generally about the time it takes for a

13

compression fracture to heal, Dr. Hughes stated that the fracture would need to be evaluated six weeks post-kyphoplasty. Dr. Hughes did not order any x-rays and had no diagnostic films available for his review — only reports. He further explained that Dr. Page's report indicating a 50% loss in height was the only reference available to him in the entire record about the extent of the fracture.

In support of the award, the ALJ stated that Dr. Page "was by far in the best position to determine the loss of height as he performed the surgical repair" and that in recognizing the differing opinions on the issue, Dr. Page had more credibility. Dr. Page's records contain several notes that support the position that Blackburn's surgery was successful and that the 50% loss of height was surgically reduced, including: (1) the post-operative diagnosis report stating that the "fracture is reduced almost to 90%"; (2) the March 24, 2014 report stating that two views of the lumbar spine were performed and reviewed and that Blackburn's status post-operation was excellent; (3) the April 22, May 20 and June 24, 2014 examination reports stating that x-rays revealed the kyphoplasty was stable based on multiple views of the lumbar spine, that "excellent height was achieved" surgically, and "[i]mpression: kyphoplasty good outcome"; and (4) the September 18, 2014 examination notes stating Blackburn had full mobility of the lumbar spine, normal disc height was observed, and the kyphoplasty rendered a good outcome. Given the noted success of the surgery and the positive indications post-operation, it is not reasonable to believe that if Blackburn suffered a 50% loss in height after the

14

injury and prior to surgery, that he retained the same loss in height after a successful surgery.

"An ALJ cannot choose to give credence to an opinion of a physician assigning an impairment rating that is not based upon the AMA *Guides.* Any assessment that disregards the express terms of the AMA *Guides* cannot constitute substantial evidence to support an award of workers' compensation benefits." *Watkins v. Kobe Aluminum USA, Inc.,* 2013-SC-000334-WC, 2014 WL 4160212, at *3 (Ky. Aug. 21, 2014) (quoting *Jones v. Brasch-Barry General Contractors,* 189 S.W.3d 149, 153-54 (Ky. App. 2006)). While the interpretation of the *Guides* is indisputably to be left to medical professionals, it does not take a medical professional to note that the *Guides* require impairment ratings to be assessed after MMI is reached. The ALJ did not make specific findings regarding when Blackburn reached MMI, but the ALJ awarded temporary total disability benefits through June 24, 2014, when Dr. Page released him to return to work while wearing a back brace.

As to the clear indication that Blackburn's loss of height was remedied by surgery, the ALJ's opinion recognizes that "it appears that after healing, the 50% loss of height was significantly reduced." However, the ALJ uses an example in the *Guides* to rationalize why he still believed that placement in DRE lumbar category III for a 25-50% compression fracture of a vertebral body is appropriate. The ALJ notes that Example 15-5 set forth in the *Guides* does not indicate or leaves the impression that the height loss measurement was taken after treatment. *Guides* at 387. Instead, the individual in the example

15

was assessed into DRE lumbar category IV for having a burst fracture with greater than 50% loss of height with neurological findings. *Id.* The example involves a 54-year old woman who fell from a ladder and sustained a burst fracture with a 55% loss of height. *Id.* She was treated with bracing and the fracture healed. *Id.* The clinical studies indicated that the fracture "*healed with a 60% loss of height,*" so she was placed in DRE IV for having a burst fracture greater than 50%. *Id.* (emphasis added).

The example does not indicate that the individual was treated with surgery, and instead suggests that the fracture worsened. The ALJ stated that the example "does not indicate or leaves the impression the measurement was taken after treatment." But the example states the fracture "healed" with a 60% loss, suggesting that the degree of the fracture was assessed after healing, which Dr. Hughes stated would take approximately six weeks. Therefore, it is not reasonable to base an impairment rating on the assessment of a fracture conducted before surgery and before it has had time to heal. The ALJ's reliance on this example is confusing, at best, and does not help explain the reliance on the fracture assessments conducted prior to Blackburn's surgery. Further, the interpretation of the *Guides* is a medical question and no medical reports in the record contain reference to this example used by the ALJ.

On this appeal, Blackburn argues that the Board misunderstood Dr. Kriss's evaluation and report. Dr. Kriss stated that he personally reviewed the March 2014 pre-surgery CT scan of the lumbar spine and believed that there was only a 20% loss of height. Additionally, he reviewed the October 2015 MRI

16

and opined that the L3 vertebral body retained a 10% or less compression, which was "substantially reduced towards normal" compared to the March 2014 CT scan. He also noted that the cement inserted during the kyphoplasty was perfectly positioned to reduce and stabilize the previous L3 compression fracture.

Blackburn specifically criticizes Dr. Kriss's reference to a 20% fracture and states that the Board clearly misunderstood this evidence. However, this reference seems to be based on Dr. Kriss's opinion, that after reviewing the pre-surgery March 2014 diagnostics, Blackburn's fracture resulted in only a 20% loss of height, not a 50% loss as indicated by Dr. Page. The references on page 17 of Dr. Kriss's report, as highlighted by Blackburn, seem to be referring to the original injury which Dr. Kriss used to support his opinion that Blackburn has an excellent long-term prognosis. Upon review, the Board offered little discussion of Dr. Kriss's medical opinion and this discussion seemed to accurately summarize Dr. Kriss's report in the record.

Blackburn also argues that both Dr. Kriss and Dr. Hughes assessed Blackburn's impairment long after he reached MMI in October 2014. However, this Court believes the *Guides* do not mean that the evaluation itself must be conducted after MMI is reached, but rather the impairment rating must be based on the employee's condition once MMI is reached. Although it is undisputed that Dr. Hughes assessed Blackburn's impairment at a time after Blackburn reached MMI, Dr. Hughes relied on medical reports created before surgery and before Blackburn healed, therefore before he reached MMI.

17

## CONCLUSION

Because the report and subsequent testimony of Dr. Hughes does not constitute substantial evidence as required when determining an impairment rating, and because Dr. Autry's opinion did not apportion the impairment for the L3 and L4 injuries, the ALJ's opinion cannot stand. While no one disputes that Blackburn sustained a compensable injury to his L3 vertebra, any such award for impairment must be based on the *Guides* and cannot include assessment for an unrelated condition. Therefore, we reverse the Court of Appeals' opinion, reinstate the Board's opinion and consequently remand to the ALJ for findings consistent with this Opinion.

Minton, C.J.; Buckingham, Hughes, Keller, VanMeter, and Wright, JJ., sitting. All concur. Lambert, J., not sitting.

COUNSEL FOR APPELLANT:

Scott Mitchell Burns Brown
FOWLER BELL PLLC

COUNSEL FOR APPELLEE, GARY BLACKBURN::

McKinnley Morgan
MORGAN COLLINS YEAST & SALYER

18

# Supreme Court of Kentucky

## 2018-SC-000543-WC

ORMSCO, INC.                                                                                    APPELLANT


ON APPEAL FROM COURT OF APPEALS
V.                    CASE NO. 2017-CA-001227-WC
WORKERS' COMPENSATION BOARD NO. 14-WC-91750


GARY BLACKBURN; DR. ERIN GREER,                                      APPELLEE
KENTUCKY ONE HEALTH-PCA; HON.
JOHN B. COLEMAN, ADMINISTRATIVE
LAW JUDGE; AND WORKERS'
COMPENSATION BOARD


## ORDER DENYING PETITION FOR REHEARING

The Petition for Rehearing, filed by the Appellee, of the Memorandum

Opinion of the Court, rendered August 29, 2019, is DENIED. The Court,

however, issues the attached modified opinion to correct clerical errors.

Minton, C.J.; Hughes, Keller, Nickell, VanMeter and Wright, JJ., sitting.

All concur. Lambert, J., not sitting.

ENTERED: December 19, 2019

_____
CHIEF JUSTICE