RENDERED: SEPTEMBER 22, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0159-DG

RIVER CITY FRATERNAL ORDER OF　　　　　　　　　　APPELLANT
POLICE LODGE NO. 614, INC.


　　　　　　　　　　ON REVIEW FROM COURT OF APPEALS
V.　　　　　　　　　　NO. 2020-CA-0266
　　　　　　　　JEFFERSON CIRCUIT COURT NO. 18-CI-006171


LOUISVILLE/JEFFERSON COUNTY METRO　　　　　　　APPELLEES
GOVERNMENT AND KENTUCKY LABOR
CABINET


**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>REVERSING AND REMANDING</u>**


The River City Fraternal Order of Police Lodge No. 614, Inc. (FOP) filed an unfair labor practice claim against the Louisville-Jefferson County Metro Government (Louisville Metro). The FOP alleged that the Louisville Metro Police Department (LMPD) engaged in an unfair labor practice by coercing Sergeant David Mutchler, the FOP President, to reveal communications he had with Sergeant Armin White[1] that the FOP asserted were protected by a "union business privilege." The Kentucky Labor Cabinet found that because no union business privilege exists in the Commonwealth, LMPD did not engage in an

---

[1] The record reflects that since the events pertinent to this case occurred, White has been promoted to the rank of Lieutenant. However, for the sake of consistency and clarity, we will refer to White as a sergeant.

unfair labor practice. Both the Jefferson Circuit Court and the Court of Appeals affirmed. This Court granted discretionary review. After a thorough review of the record and arguments of the parties, we reverse and remand to the Labor Cabinet.

## I. BACKGROUND

On January 11, 2017, LMPD Officer Sergeant Armin White met with his direct supervisor, Lieutenant Donald George, to discuss issues he was experiencing in the workplace. Sgt. White reported directly to Lt. George, but he also had certain administrative duties under a different lieutenant. Sgt. White claimed that he was receiving conflicting orders from Lt. George and the other lieutenant and needed a resolution. Following this meeting, Lt. George submitted a memorandum to his superior, Major Thomas Dreher, alleging that Sgt. White complained to him of a "hostile work environment." LMPD's Professional Standards Unit (PSU) began investigating. During this investigation, Sgt. White denied making a hostile work environment accusation. Thus, the PSU also began investigating whether Lt. George filed a false report.

Lt. George sought guidance from Sgt. David Mutchler, in Sgt. Mutchler's capacity as President of the FOP, both after his initial conversation with Sgt. White and after he was given notice by the PSU that he was being investigated. Additionally, he met with Sgt. Mutchler and the FOP's legal counsel to prepare for his interview with the PSU. Sgt. Mutchler also sent one email to and had one brief telephone conversation with Sgt. White concerning the matter.

2

In May 2017, the PSU notified the FOP that it wanted to interview Sgt. Mutchler regarding his conversations with Lt. George and Sgt. White. The FOP objected to any interview of Sgt. Mutchler, asserting a "union business privilege" that completely protected those conversations from disclosure. After discussion between counsel for the parties, the PSU narrowed its requested interview scope to only Sgt. Mutchler's conversation with Sgt. White. At the request of the PSU, Sgt. White had initialed a document purporting to "waive any client privilege that may or may not exist regarding [his] conversations with" Sgt. Mutchler. The FOP continued to object to the interview and filed a charge of Unfair Labor Practice against Louisville Metro with the Kentucky Labor Cabinet. The FOP alleged that the LMPD's effort to interrogate Sgt. Mutchler regarding his actions in his role as President of the FOP, including his conversations with Sgt. White and Lt. George, was unlawful coercion and therefore an unfair labor practice.

Despite the FOP's objection, the PSU went forward with Sgt. Mutchler's interview on August 2, 2017. At the beginning of the interview, Sgt. Mutchler was warned that he was required to answer the questions completely and truthfully and that failure to do so could lead to discipline, up to and including termination. Sgt. Mutchler responded that he was answering the questions "under protest," believing that any conversations he had as FOP President were privileged. The PSU then questioned Sgt. Mutchler about his conversation with Sgt. White. Sgt. Mutchler told the PSU that Sgt. White told him that he did not want to be in the middle of conflicts between those above his rank. Sgt.

3

Mutchler, however, could not remember if they discussed the filing of the hostile work environment claim. The PSU did not ask him any questions about his conversations with Lt. George.

On October 5, 2017, a hearing was held before a hearing officer from the Labor Cabinet. At that hearing, both Sgt. Mutchler and Sgt. White testified that Sgt. Mutchler scheduled a meeting with Lt. George and FOP counsel and that Sgt. Mutchler sent Sgt. White an email inviting him to that meeting. Both testified that Sgt. White called Sgt. Mutchler to decline the invitation and that they engaged in a short conversation. Sgt. White testified that he did not consider his conversation with Sgt. Mutchler confidential and that he never asked for assistance from the FOP. Sgt. White acknowledged that he voluntarily signed[2] the waiver allowing the PSU to question Sgt. Mutchler about their conversation.

In its briefs to the hearing officer, the FOP again asserted a union business privilege. It argued that the union business privilege belongs not only to the members of the union, but to the union itself. The FOP argued that an individual has no standing to waive the union's privilege, and thus, White's waiver was ineffectual. The FOP asserted that Sgt. Mutchler's conversation with Sgt. White was conducted in furtherance of Sgt. Mutchler's representation of Lt. George and thus was covered by the privilege. The FOP acknowledged, however, that the union business privilege is limited in scope, applying only in

---

[2] Although Sgt. White testified that he "signed" the waiver, he only initialed it.

the collective bargaining context and not in other contexts such as litigation unrelated to collective bargaining.

Louisville Metro, on the other hand, argued that there was no justiciable controversy. Specifically, Louisville Metro argued that Kentucky Revised Statutes (KRS) Chapter 67C, which in part creates the right of police officers in consolidated local governments to organize for the purpose of collective bargaining, does not expressly provide for a union business privilege and that the Labor Cabinet lacks the authority to make such a privilege. Louisville Metro further asserted that even if a union business privilege exists, it only applies to conversations Sgt. Mutchler had in his representative capacity, and Sgt. Mutchler was not acting in that capacity in his conversation with Sgt. White.

In his recommended order, the hearing officer found that Sgt. Mutchler's conversation with Sgt. White took place while Sgt. Mutchler was acting in his representative capacity as President of the FOP. He further found that Sgt. Mutchler was compelled by the LMPD to disclose the substance of that conversation. The hearing officer opined that he believed a privilege should protect the substance of this conversation but asserted that he could not make that policy decision in his role as hearing officer. The hearing officer then recommended that the Labor Cabinet yield to the courts to determine if the privilege exists.

In its final order, the Labor Cabinet accepted the factual findings of the hearing officer, specifically finding that Sgt. Mutchler's conversation with Sgt. White occurred within the course of Sgt. Mutchler's duties as FOP President

and that this conversation could have been relevant to the advice Sgt. Mutchler gave to Lt. George. The Labor Cabinet also found that Sgt. Mutchler was compelled by the LMPD to disclose the substance of his conversation with Sgt. White.

Like the hearing officer, the Labor Cabinet found that the explicit language of KRS Chapter 67C does not create a union business privilege and that Kentucky has yet to recognize the privilege. Finally, the Labor Cabinet stated that it did not have the authority to create the privilege under these circumstances. Thus, the Labor Cabinet found that Louisville Metro did not engage in an unfair labor practice when the LMPD compelled Sgt. Mutchler to reveal the substance of his conversation with Sgt. White.

The FOP filed a petition for judicial review in Jefferson Circuit Court against both Louisville Metro and the Labor Cabinet. The petition alleged that Louisville Metro engaged in an unfair labor practice by interfering, restraining, and coercing police officers in the exercise of their rights under KRS 67C.402. It further alleged that the Labor Cabinet's final order was arbitrary, capricious, an abuse of discretion, and deficient because it failed to recognize that the legislature had adopted the union business privilege and failed to find that the questioning of Sgt. Mutchler was an unfair labor practice.

The FOP asserted the importance of the union business privilege is that it protects communications which, if involuntarily disclosed, would have a chilling effect on the union's ability to investigate disciplinary matters. The FOP

6

further acknowledged that the privilege applies only in the collective bargaining context and not in unrelated litigation.

Louisville Metro, on the other hand, argued that there was no justiciable controversy because no union business privilege exists and, even if it does exist, it was waived. Regarding waiver, Louisville Metro asserted that if the privilege exists, it belongs to the union member, in this case White, and can be waived by that member. Louisville Metro acknowledged that if the privilege exists the FOP can claim it on the member's behalf, but can only do so if the member does not waive the privilege. According to Louisville Metro, White waived any purported privilege. The Labor Cabinet adopted the arguments of Louisville Metro.

The circuit court affirmed the Labor Cabinet's order finding that Louisville Metro did not commit an unfair labor practice when it compelled Sgt. Mutchler to reveal his conversation with Sgt. White. The circuit court stated that the legislature has the sole authority to create a privilege and that the statutes at issue do not do so.

The FOP then appealed to the Court of Appeals. Notably, to the Court of Appeals, the FOP further refined the bounds of the union business privilege for which it advocated. The FOP asserted that the privilege applies only in the collective bargaining context and only when the union agent in question (in this case, Sgt. Mutchler) is employed by the agency compelling disclosure (in this case, LMPD). The FOP further asserted that the privilege only applies to information the union agent has gathered in order to assist an officer in

7

"anticipated or ongoing disciplinary proceedings." The FOP stated that the privilege has no application in court proceedings or administrative proceedings other than the disciplinary proceedings about which the communications were made.

In its opinions, the Court of Appeals was severely fractured. The plurality opinion, acknowledging strong reservations about the existence of a union business privilege, refused to directly answer the question of whether one exists. It reasoned that even if it does exist, it belonged to Sgt. White, who waived any privilege that may exist. The plurality opinion further noted that the recognition of any privilege lies with this Court or the legislative branch, that this Court has not promulgated a rule creating the privilege, and that KRS Chapter 67C does not explicitly recognize a privilege. Thus, the Court of Appeals affirmed the circuit court.

A separate concurring opinion agreed with the reasoning and result of the plurality opinion but emphasized that the FOP did not have standing to assert the privilege. The separate opinion further emphasized that Sgt. White made a knowing and voluntary waiver of any privilege that may exist. The concurring opinion also opined that an intermediate appellate court was not authorized to adopt the broad reading of the relevant statutes that would be necessary to infer a union business privilege, as only the legislature and this Court have the authority to do so.

The dissenting opinion by contrast would have held that KRS Chapter 67C "implicitly creates a limited 'privilege' such that the FOP representative

8

cannot be compelled to disclose the content of communications with union members about internal disciplinary proceedings to the employer." The dissent agreed that the privilege belongs to the union member, but noted that the Labor Cabinet did not make a finding that Sgt. White had validly waived the privilege, and thus, the dissent would have remanded to the Labor Cabinet for that determination. Although the dissent referred to it as the "union business privilege" for ease of reference, the dissent opined that the word "privilege" "imbues a meaning of consequence far more reaching than" what is really sought. The dissent asserted that what exists is actually a confidence, as the communications between an employee and his union representative regarding internal disciplinary proceedings within the context of KRS Chapter 67C are confidential and disclosure cannot be compelled by the employer.

The FOP then sought discretionary review by this Court, which we granted. To this Court, the FOP seemingly adopts the view of the Court of Appeals' dissent that what it has been calling a privilege is actually a confidence. Regardless, the FOP advocates to this Court the same bounds of protection that it advocated to the Court of Appeals. Louisville Metro and the Labor Cabinet argue to this Court consistently with their arguments to the lower tribunals.

## II. STANDARD OF REVIEW

Generally, "our review of the decision of an administrative agency is highly deferential, and we reverse only if the decision was arbitrary, unsupported by substantial evidence, or otherwise erroneous as a matter of

law." *Jefferson Cnty. Sheriff's Off. v. Kentucky Ret. Sys.*, 626 S.W.3d 554, 558 (Ky. 2021) (citations omitted). "Substantial evidence means evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men." *Miller v. Tema Isenmann, Inc.*, 542 S.W.3d 265, 270 (Ky. 2018) (citation omitted). However, we review questions of law de novo, including the application and interpretation of statutes. *Jefferson Cnty. Sheriff's Off.*, 626 S.W.3d at 558 (citation omitted).

"[T]he cardinal rule of statutory construction is that the intention of the legislature should be ascertained and given effect." *MPM Fin. Group, Inc. v. Morton*, 289 S.W.3d 193, 197 (Ky. 2009) (citation omitted); *Saxton v. Commonwealth*, 315 S.W.3d 293, 300 (Ky. 2010) ("Discerning and effectuating the legislative intent is the first and cardinal rule of statutory construction."). This fundamental rule is underscored by KRS 446.080(1), which states in relevant part, "All statutes of this state shall be liberally construed with a view to promote their objects and carry out the intent of the legislature." The basic principles of statutory construction have been summarized as follows:

> In construing statutes, our goal, of course, is to give effect to the intent of the General Assembly. We derive that intent, if at all possible, from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration. . . . We presume that the General Assembly intended for the statute to be construed as a whole, for all of its parts to have meaning, and for it to harmonize with related statutes. . . . We also presume that the General Assembly did not intend an absurd statute or an unconstitutional one. . . . Only if the statute is ambiguous or otherwise frustrates a plain reading, do we resort to extrinsic aids such as the statute's legislative history; the canons of construction; or, especially in the case of model or uniform statutes, interpretations by other courts.

10

*Shawnee Telecom Res., Inc. v. Brown*, 354 S.W.3d 542, 551 (Ky. 2011) (internal citations omitted).

With these standards in mind, we review the issues presented to us in the case at bar.

### III. ANALYSIS

At the center of this case is the function of the FOP as a labor organization for its police officer members. A labor organization in this context is "any chartered labor organization of any kind in which police officers participate and which exists for the primary purpose of dealing with consolidated local governments concerning grievances, labor disputes, wages, rate of pay, hours of employment, or conditions of employment." KRS 67C.400(2). Labor organizations such as the FOP have the exclusive "authority and the duty to bargain collectively" on behalf of their police officer members. KRS 67C.404. Collective bargaining consists of good faith negotiations regarding a variety of workplace concerns, including negotiating conditions of employment, wages, and hours. KRS 67C.406. They do this through representatives like Sgt. Mutchler who are elected to act on behalf of the labor organization and its members to a consolidated local government. *See* KRS 67C.402, 67C.404.

The legal question before this Court is whether Louisville Metro committed an unfair labor practice when it compelled Sgt. Mutchler to disclose the substance of his conversation with Sgt. White. Specifically, the FOP asks this Court to find that Louisville Metro violated KRS 67C.402 by violating the

11

officers' right to "be protected in the exercise of[] the right of self-organization . . . free from interference, restraint, or coercion."

KRS 67C.402 broadly protects the ability of a police officer to work with their union representative on questions related to the conditions of their employment. Some negotiations are only possible through the representation of a union representative and the anonymity of the complainant. If, during internal investigations or negotiations, the metro government could compel a union representative to divulge sensitive information, then the power of the protection within KRS 67C.402 becomes illusory. Allowing Louisville Metro to compel information under threat of discipline will severely discourage other FOP members from candidly discussing their own problems with FOP presidents or representatives in the future.

We need look no further than the statute itself to determine that the legislature could not have intended for the protection to lack force or meaning as it relates to conditions of employment such as the disciplinary hearing at the center of this case. "Free from interference" certainly includes interference with an active disciplinary case—a "condition[] of employment"—for which Sgt. Mutchler was consulted. KRS 67C.402. To preserve the intent of the legislature to prevent interference with collective bargaining, we must acknowledge the protection of union communications inherent within the statutory scheme.

In outlining the boundaries of our protection, we find it instructive to look to similar protections in other jurisdictions. A version of the union business privilege was first considered by New York in *City of Newburgh v.*

*Newman*, 421 N.Y.S.2d 673 (N.Y. App. Div. 1979). The facts of that case are quite similar to those in the one at bar. In *City of Newburgh*, a police officer contacted his union representative regarding a disciplinary matter. *Id.* at 674. Later, the city attempted to question the representative about communications with the officer at the center of the disciplinary matter. *Id.* at 674–75. New York had a law granting employees "the right to be represented by employee organizations to negotiate collectively with their public employers in the determination of their terms and conditions of employment, and the administration of grievances arising thereunder." *Id.* at 675 (citation omitted). Under that law, the state's Public Employment Relations Board held that it was unlawful to compel the union representative's communications with the officer. *Id.* On appeal, the Appellate Division affirmed. In doing so, the court recognized both the necessity and limits of what it called a union privilege:

> Any privilege established by the decision of the board is strictly limited to communications between a union member and an officer of the union, and operates only as against the public employer, on a matter where the member has a right to be represented by a union representative, and then only where the observations and communications are made in the performance of a union duty. The purpose is the protection of the right to fully participate in an employee organization, with the full benefits thereof and inquiries such as the one herein would seriously hamper such participation.

*Id.* at 676.

The reasoning behind New York's privilege is similar to those outlined in *Cook Paint & Varnish Co.*, 258 N.L.R.B. 1230 (1981). *Cook Paint* established a union business privilege in the context of collective bargaining and arbitration,

13

reasoning that "[t]o allow Respondent here to compel the disclosure [of communications between an officer and a union representative] under threat of discipline manifestly restrains employees in their willingness to candidly discuss matters with their chosen, statutory representatives." *Id.* at 1232. That protection applies only as to the employer, and only where the union is representing union member interests. *Id.*

While these cases are instructive, we must look to the law of the Commonwealth to correctly determine the nature of this protection in Kentucky. First, we must determine whether the protection at issue constitutes a privilege. A privilege is invoked to exclude relevant evidence. *Stidham v. Clark*, 74 S.W.3d 719, 725 (Ky. 2002). Privileges are exclusively within the power of the legislature to create, and they "apply at *all* stages of all actions, cases, and proceedings" of law. *Commonwealth, Cabinet for Health & Fam. Servs. v. Chauvin*, 316 S.W.3d 279, 284–86 (Ky. 2010) (emphasis added); KRE 1101(c). For that reason, the kind of protection over communications at issue between the FOP and Louisville Metro is clearly not a privilege. Rather than a privilege, the protection afforded by KRS 67C.402 is better understood as a *confidence*. It operates only against Louisville Metro, and only under circumstances covered by KRS 67C.402. Like the protection in *City of Newberg*, however, we hold that the confidentiality created by KRS 67C.402 is

> limited to communications between a union member and an officer
> of the union, and operates only as against the public employer, on
> a matter where the member has a right to be represented by a
> union representative, and then only where the observations and
> communications are made in the performance of a union duty.

14

*City of Newburgh,* 421 N.Y.S.2d at 676. The confidentiality does not and cannot apply to legal proceedings.

Because KRS 67C.402 creates a limited confidentiality for union representative communications with members, it cannot be unilaterally waived. Both the FOP's individual members and the FOP are entitled to confidentiality. The FOP is so entitled because of its function as a collective bargaining unit representing many individuals, and its sole purpose is to advocate for the best interests of the group. An individual member may choose to breach the confidence themselves, but they cannot waive it for the organization. Thus, the FOP is entitled to its own protection of confidentiality. While Sgt. White can personally and voluntarily recount conversations in which he was involved, no waiver from him could be effectual to breach the FOP's protections over the same matter.

If local governments could strategically select one officer at a time and obtain waivers for confidential information sought from the FOP, then the function of the union is effectively diluted. This dilution is caused by the imbalance in negotiations created by one party having access to both sides' information, while the other party only has access to its own. The consequences of this dilution are borne by the FOP itself because it inhibits its ability to collectively bargain, which it has a legal duty to do under the statutes. KRS 67C.404. These consequences are all the more significant given that the FOP is, by law, the *exclusive* representative of its police officer members. *Id.* Without the FOP, police officers would have no ability to organize

15

to collectively address problems in the workplace. Allowing for interference with this ability cannot be the intent of the legislature as it is in direct contradiction with KRS 67C.402.

The Cabinet found that Sgt. Mutchler was compelled to disclose the content of a conversation that occurred while he was acting in a representative capacity. A thorough review of the record reveals that these findings are supported by substantial evidence. Because Sgt. White could not have waived confidentiality for the FOP, and because the statute clearly requires a limited confidence in order to be effectual, Sgt. Mutchler should not have been compelled to disclose the substance of his communications with Sgt. White. In compelling him to do so, Louisville Metro unlawfully interfered with the right of the police officers to bargain collectively regarding conditions of employment under KRS 67C.402(1). Accordingly, Louisville Metro committed an unfair labor practice under KRS 67C.410.

## IV. CONCLUSION

For the foregoing reasons, we reverse the decision below and remand to the Labor Cabinet to enter a cease and desist order pursuant to KRS 67C.410(2) in accordance with our Opinion.

All sitting. All concur.

16

COUNSEL FOR APPELLANT, RIVER CITY FRATERNAL ORDER OF POLICE LODGE NO. 614, INC.:

David Leightty
Priddy, Cutler, Leightty & Meade, PLLC

COUNSEL FOR APPELLEE, LOUISVILLE/JEFFERSON COUNTY METRO GOVERNMENT:

Whitney Wellman Meagher
David Andrew Sexton
Assistant Jefferson County Attorneys

COUNSEL FOR APPELLEE, KENTUCKY LABOR CABINET:

John Ross Rogers
Kentucky Labor Cabinet

COUNSEL FOR AMICI, THE AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES COUNCIL 962; AMALGAMATED TRANSIT UNION LOCAL 1447; KENTUCKY PROFESSIONAL FIRE FIGHTERS; INTERNATIONAL ASSOCIATION OF FIREFIGHTERS LOCAL 38; INTERNATIONAL ASSOCIATION OF FIREFIGHTERS LOCAL 45; INTERNATIONAL ASSOCIATION OF FIREFIGHTERS LOCAL 168; INTERNATIONAL ASSOCIATION OF FIREFIGHTERS LOCAL 345; INTERNATIONAL ASSOCIATION OF FIREFIGHTERS LOCAL 526; INTERNATIONAL ASSOCIATION OF FIREFIGHTERS LOCAL 1928; LABORERS INTERNATIONAL UNION OF NORTH AMERICA LOCAL 576; AND NATIONAL CONFERENCE OF FIREMEN AND OILERS/SEIU LOCAL 32BJ:

David O'Brien Suetholz
Andrew Evan Mize
Branstetter, Stranch & Jennings, PLLC

COUNSEL FOR AMICUS, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION 369:

Benjamin S. Basil
IBEW Local Union 369

COUNSEL FOR AMICUS, KENTUCKY STATE LODGE FRATERNAL ORDER OF POLICE:

Stephen Dale Wolnitzek
Wolnitzek & Rowekamp, PLLC