RENDERED: MARCH 22, 2018
TO-BE-PUBLISHED

# Supreme Court of Kentucky

2016-SC-000449-WC

JEFF MILLER                                                                          APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.                        CASE NO. 2015-CA-001544-WC
DEPARTMENT OF WORKERS' CLAIMS NO. 2012-WC-00400

TEMA ISENMANN, INC., HON. WILLIAM J.                           APPELLEE
RUDLOFF, ADMINISTRATIVE LAW JUDGE
AND WORKERS' COMPENSATION BOARD

**OPINION OF THE COURT BY JUSTICE WRIGHT**

**REVERSING**

Appellant, Jeff Miller, worked for Appellee, TEMA Isenmann, Inc., for

fifteen years. Miller was diagnosed with and treated for bladder cancer, which

he asserts stemmed from exposure to a workplace carcinogen. He sought

permanent total disability benefits based upon his assertion that his bladder

cancer amounted to an occupational disease. The administrative law judge (ALJ)

awarded the benefits Miller sought. TEMA appealed to the Workers'

Compensation Board, which vacated and remanded back to the ALJ. On

remand, the ALJ awarded the same benefits and the Board vacated and

remanded yet again. On TEMA's third appeal, however, the Board affirmed the

ALJ. TEMA appealed the Board's decision to the Court of Appeals, which

reversed. Miller appeals that decision to this Court as a matter of right. *See*

*Vessels v. Brown-Forman Distillers Corp.*, 793 S.W.2d 795, 798 (Ky. 1990); Ky. Const. § 115.

## I. BACKGROUND

TEMA is a German-owned, multi-national company that produces industrial screens. Miller worked for TEMA from 1995 until 2010 as a purchasing agent. Though he was not involved in the actual production process, Miller's office door opened into the plant. Miller's job duties required him to enter the production floor daily to check the inventory. He claims that MOCA, a curing agent, was airborne in the plant.

MOCA was used by TEMA in its production facility during Miller's tenure (though the company has since stopped using the agent, as the Occupational Safety and Health Administration ordered TEMA to make costly changes to its operations to continue using MOCA). MOCA is scientifically proven to cause cancer in animals and is highly suspected of being a human carcinogen as well. Testimony from a TEMA plant manager described the "closed system" which was in place on the production floor when Miller retired. In this closed system, MOCA was never open to the air and employee exposure is limited. However, Miller and the TEMA manager both testified that this system was only in place from around 2005 onward (only for approximately the last five years of Miller's fifteen-year tenure with the company).

Prior to implementation of the closed system, TEMA employees added MOCA to the production process manually via an older open-air machine. In using that system, production workers removed bags of MOCA pellets from cardboard drums, cut the bags open with carpenter's knives, and manually poured the MOCA pellets into the machine. This process is how Miller believes

2

MOCA became airborne in the plant, thus leading to his exposure. TEMA denies that MOCA was ever airborne in the production facility and contends that the facility boasts a favorable record for the safety and health of its employees.

TEMA monitored workers for MOCA exposure by testing employees' urine. Specifically, the company tested production employees—but never office employees—for exposure once every three months. When a production plant employee tested positive for MOCA exposure, TEMA altered the employee's job duties until MOCA was no longer present in the employee's urine. Because Miller was an office employee, TEMA never tested him for MOCA exposure. However, Miller testified that two to three production employees usually tested positive for MOCA each time TEMA tested employees' urine. The TEMA plant manager testified that he has managed the plant since 2001, and that in that time only two to three employees ever tested positive for MOCA exposure. At any rate, whether the number was two to three every three months or two to three total, it is undisputed that *some* number of employees tested positive for MOCA exposure.

In 2010, Miller retired from TEMA. Later that same year, doctors diagnosed him with bladder cancer. Miller's cancer required the removal of his bladder, radiation, and chemotherapy. On March 29, 2012, Miller filed an Application for Resolution of Occupational Disease Claim, alleging that his

3

cancer was caused by MOCA exposure during his employment with TEMA. On September 13, 2012, the ALJ rendered an opinion determining that Miller's bladder cancer was causally related to workplace exposure to MOCA and awarded permanent total disability and medical benefits. TEMA moved the ALJ to order a university medical evaluation pursuant to KRS 342.315, but the ALJ denied that motion.

TEMA appealed to the Board, arguing that the ALJ's finding that Miller's bladder cancer was caused by exposure to MOCA was not supported by substantial evidence and that the ALJ erred by refusing to order a university medical evaluation. Concluding that university evaluations are mandatory in occupational disease claims, the Board vacated the ALJ's order and remanded the case, ordering the university evaluation to be performed under KRS 342.315 and 342.316(3)(b)(4)(b).

On February 15, 2013, the ALJ ordered Miller to undergo a university medical evaluation to be scheduled by the Department of Workers' Claims (DWC). Six days later, the ALJ entered a follow-up order advising the parties that the DWC had informed him "that there [we]re no university evaluators available for this case at either the University of Kentucky or the University of Louisville," and that "[f]or that reason, a university evaluation [wa]s not possible." The ALJ thus ordered the parties to confer and agree on an independent medical evaluator. Both parties objected to the opinion of a

4

physician who was not a university employee being given presumptive weight under the statutes.

Still, the ALJ ordered both parties to produce three names of willing physicians from which the ALJ would choose an evaluator. Miller produced three options, though none of the doctors were oncologists. TEMA asked for an extension of time to continue searching for qualified doctors willing to participate, noting a lack of expertise in cancer diagnosis and treatment among the proposed field of candidates. The ALJ denied TEMA's request and chose one of the physicians offered by Miller, Dr. David Jackson, a physical-medicine-and-rehabilitation physician.

Dr. Jackson completed his evaluation, and assigned Miller a fifty-eight percent impairment rating pursuant to AMA guidelines. However, Dr. Jackson stated that he had no opinion as to the cause of Miller's cancer. The ALJ again entered an opinion finding that Miller's bladder cancer was caused by exposure to MOCA through his employment with TEMA and awarded permanent total disability and medical benefits.

TEMA appealed this decision to the Board, and the Board once again vacated and remanded the case to the ALJ. In doing so, the Board first ruled that the ALJ's assertions as to the unavailability of university evaluators lacked sufficient support in the record. The Board required the ALJ to file correspondence from the DWC "memorializ[ing], with specificity, the

5

availability, or lack thereof, of university evaluators in this litigation." The Board then added that even if no university evaluator was willing to participate, the mandatory language of KRS 342.316(3)(b)(4)(b) requires the Commissioner to choose a physician to perform the evaluation. It held the ALJ abused his discretion by not "request[ing] the Commissioner to choose a physician who will act in place of the university evaluator."

On remand, the ALJ directed the Commissioner to schedule an evaluation. The Commissioner eventually responded with an order asserting that a university evaluation under KRS 342.315 "is impossible and cannot be scheduled" because the medical schools "have no physician who can or will conduct an examination and offer an opinion." The order also stated that the Commissioner could not schedule an independent examination as required by KRS 342.316, explaining that although qualified doctors had been identified, each declined to participate. "[F]urther delay in deciding the claim," the Commissioner's order concluded, would be "unreasonable and the matter should proceed to conclusion in the interest of justice."

The ALJ again entered an opinion finding Miller's bladder cancer to be a compensable occupational disease and awarding permanent total disability and medical benefits. When TEMA appealed for the third time, the Board affirmed the ALJ. Despite the Board's initial insistence on a university evaluation, the Board was satisfied that the Commissioner had fulfilled his statutory and

6

regulatory obligations. The Board also addressed and rejected TEMA's argument that substantial evidence did not support the ALJ's finding that Miller's employment exposed him to MOCA and caused his bladder cancer.

TEMA appealed to the Court of Appeals, which reversed and remanded. That court disagreed with the Board's conclusion that the Commissioner's sincere attempts to schedule Miller for a medical evaluation were statutorily sufficient. Instead, the Court of Appeals held that the statutory language requires the Commissioner to refer all occupational disease claimants to an unbiased medical evaluator chosen by the Commissioner. "Nothing in the statute," that court added, "allows for any exception to that legislative mandate." Consequently, the Court of Appeals vacated the decision of the Workers' Compensation Board and remanded the case to the ALJ for a new order requiring the Commissioner to produce a university evaluation, or, "if that is impossible, find an independent and qualified medical expert either by recommendation of the University of Louisville or the University of Kentucky or by independent search for a qualified university medical evaluator from outside these universities." The Court of Appeals ordered the ALJ to consider this evaluation in making a new determination as to whether Miller had met his burden of proof in showing that he was exposed to MOCA during his employment with TEMA resulting in occupational disease.

Miller now appeals that decision to this Court as a matter of right. *See*

*Vessels*, 793 S.W.2d at 798; Ky. Const. § 115. It should also be noted that

Miller, as the claimant, "bears the burden of proof with respect to every

element of the case." *Morrison v. Home Depot*, 279 S.W.3d 172, 175 (Ky. App.

2009).

## II. STANDARD OF REVIEW

Our standard of review in workers' compensation claims differs

depending on whether we are reviewing questions of law or questions of fact.

"As a reviewing court, we are bound neither by an ALJ's decisions

on questions of law or an ALJ's interpretation and application of the law to the

facts. In either case, our standard of review is *de novo*." *Bowerman v. Black

Equip. Co.*, 297 S.W.3d 858, 866 (Ky. App. 2009).

As to questions of fact, "[t]he ALJ as fact finder has the sole authority to

judge the weight, credibility, substance, and inferences to be drawn from the

evidence." *LKLP CAC Inc. v. Fleming*, 520 S.W.3d 382, 386 (Ky. 2017) (citing

*Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418, 419 (Ky. 1985).

Furthermore,

> KRS 342.285 gives the ALJ the sole discretion to determine
> the quality, character, and substance of evidence. As fact-finder,
> an ALJ may reject any testimony and believe or disbelieve various
> parts of the evidence, regardless of whether it comes from the same
> witness or the same party's total proof. KRS 342.285(2) and KRS
> 342.290 limit administrative and judicial review of an ALJ's
> decision to determining whether the ALJ "acted without or in
> excess of his powers;" whether the decision "was procured by

8

fraud;" or whether the decision was erroneous as a matter of law. Legal errors would include whether the ALJ misapplied Chapter 342 to the facts; made a clearly erroneous finding of fact; rendered an arbitrary or capricious decision; or committed an abuse of discretion.

*Abel Verdon Const. v. Rivera*, 348 S.W.3d 749, 753–54 (Ky. 2011) (footnotes omitted).

"Where the party with the burden of proof was successful before the ALJ, the issue on appeal is whether substantial evidence supported the ALJ's conclusion." *Whittaker v. Rowland*, 998 S.W.2d 479, 481 (Ky. 1999). "Substantial evidence means evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men." *Smyzer v. B.F. Goodrich Chemical Co.*, 474 S.W.2d 367 (Ky. 1971).

## III. ANALYSIS

### A. Substantial Evidence

This Court must determine if the ALJ's findings that Miller was exposed to MOCA at the TEMA production facility and that this exposure resulted in an occupational disease were supported by substantial evidence.

KRS 342.0011(3) explains that an occupational disease:

shall be deemed to arise out of the employment if there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is performed and the occupational disease, and which can be seen to have followed as a natural incident to the work as a result of the exposure occasioned by the nature of the employment and which can be fairly traced to the employment as the proximate cause.

9

The occupational disease shall be incidental to the character of the business and not independent of the relationship of employer and employee. An occupational disease need not have been foreseen or expected but, after its contraction, it must appear to be related to a risk connected with the employment and to have flowed from that source as a rational consequence.

KRS 342.0011(4) defines "injurious exposure" as "that exposure to occupational hazard which would, independently of any other cause whatsoever, produce or cause the disease for which the claim is made."

We have held the statute requires only that exposure could independently cause the disease—not that it did in fact cause the disease. "All that is required . . . is that the exposure be such as *could* cause the disease independently of any other cause." *Childers v. Hackney's Coal Co.*, 337 S.W.2d 680, 683 (Ky. 1960) (emphasis added).

For Miller to prevail on his claim of occupational disease, he was required to present evidence of a "fitness to induce conviction in the minds of reasonable [persons]." *Smyzer,* 474 S.W.2d at 367. This evidence must demonstrate a "causal connection between the conditions under which the work is performed and the occupational disease," KRS 342.0011(3), and demonstrate workplace conditions that could cause Miller's cancer, *Childers,* 337 S.W.2d at 683.

The ALJ in this case specifically stated the evidence underlying his determination. The March 20, 2015, opinion and award states:

10

Based upon the credible and convincing sworn testimony of Mr. Miller and the very persuasive and compelling medical evidence from Dr. Rinehart, the treating oncologist, I make the factual determination that Mr. Miller's long-term exposure to MOCA during his employment with the defendant from 1995-2010 caused and brought about his bladder cancer . . . .

As previously stated, as the fact finder, the ALJ "has the sole authority to judge the weight, credibility, substance, and inferences to be drawn from the evidence." *Fleming*, 520 S.W.3d at 386. The ALJ also has the authority to draw inferences from the evidence. *Miller v. East Kentucky Beverage/Pepsico*, Inc. 951 S.W.2d 329, 331 (Ky. 1997). Again, "the issue on appeal is whether substantial evidence supported the ALJ's conclusion." *Whittaker*, 998 S.W.2d at 481.

We disagree with the Court of Appeals that the only evidence of exposure in this case was Miller's own subjective belief that he was exposed to MOCA. The ALJ in this case based his decision that Miller's bladder cancer was causally connected to his employment on substantial evidence. The testimony from both Miller and the TEMA plant manager reveals that MOCA exposure was not just a *potential* reality for TEMA employees. Although they disagree as to how many, Miller and TEMA agree that some employees tested positive for *actual* exposure to MOCA during the course of Miller's employment.[1] This

---

[1] TEMA has now forgone using MOCA. As a subsequent remedial measure, the ALJ did not base his award on such testimony. However, the record does reflect that it would have cost up to one million dollars to modify the factory to use MOCA while preventing exposure. OSHA studies recommended that TEMA make such renovations

11

amounted to objective proof that during Miller's tenure at TEMA, there existed conditions through which workers were exposed to MOCA. By the admission of TEMA's own plant manager, at least two or three TEMA employees had tested positive for MOCA exposure. As such, the evidence demonstrates that TEMA employees were exposed to a workplace environment in which injurious exposure to MOCA was a reality.

Miller also testified that his office door opened directly onto the production floor where MOCA was in use. The record further reveals that Miller ventured onto the production floor often and interacted daily with production floor employees. For the first ten years of his employment with TEMA, there were little or no safety procedures to prevent the risk of employee cross-contamination.

Dr. Rinehart is Miller's treating physician and the longtime Director of Oncology at the University of Kentucky Markey Cancer Center. The "very persuasive and compelling medical evidence from Dr. Rinehart" is also cited by the ALJ as being relied upon in his finding that Miller suffers an occupational disease caused by injurious exposure to MOCA. Dr. Rinehart stated that he had diagnosed Miller with bladder cancer, and that there is a greater than fifty percent chance that long-term exposure to MOCA was the cause of that cancer.

---

by completely isolating the area where MOCA was used and installing negative pressure air ventilation.

12

Dr. Rinehart is the only physician to render an opinion in this case who is an oncologist.

Here, the ALJ acted as the conduit for determining the weight of the evidence and veracity of the witnesses. The ALJ's opinion was not "so unreasonable under the evidence that it must be viewed as erroneous as a matter of law." *Ira A. Watson Dep't. Store v. Hamilton*, 34 S.W.3d 48, 52 (Ky. 2000). Thus, the issue becomes whether the ALJ's decision in this case is based upon substantial evidence "having the fitness to induce conviction in the minds of reasonable [persons]." *Smyzer*, 474 S.W.2d at 369. As noted, the record herein contains testimony from both parties that workplace conditions existed which carried the risk of injurious MOCA exposure. The fact that employees at the TEMA production plant tested positive for MOCA exposure on multiple occasions is proof that conditions at the plant existed which could lead to MOCA exposure in employees. MOCA is a known carcinogen. The ALJ combined that evidence with medical evidence that MOCA exposure of this kind could cause bladder cancer.

We know that Miller developed bladder cancer during his employment because he was diagnosed with the disease only months after retiring from TEMA, a workplace in which MOCA exposure is a known possibility. The ALJ considered the evidence of when and how Miller was exposed and the evidence of the factory conditions, operations, and "the credible and convincing sworn

13

testimony of Mr. Miller." Therefore, MOCA exposure could have induced Miller's bladder cancer. Again, KRS 342.011(4) and our case law require only that exposure *could* independently cause the disease—not that it did in fact cause the disease.

We hold that this evidence was sufficient to "induce conviction in the mind of reasonable [persons]," *Smyzer,* 474 S.W.2d at 369, that Miller was exposed to MOCA during his employment with TEMA resulting in bladder cancer—and, therefore, amounted to substantial evidence. We therefore hold that the ALJ's award was based upon substantial evidence and we reverse the Court of Appeals on these grounds.

### B. University Evaluation

Because of Kentucky's traditional economy, the most common form of occupational disease is coal workers' pneumoconiosis, or "black lung." The statutes clearly contemplate black-lung cases and address the specific procedures for obtaining and reading x-rays to determine whether the claimant in fact suffers from black lung. ALJs are often presented with widely divergent medical opinions regarding whether a certain claimant in fact suffers from black lung, and KRS 342.315 and 342.316 address that problem. The statutes award a favorable, yet rebuttable, presumption to evidence from a university evaluation from either the University of Kentucky or the University of Louisville. Other occupational diseases are lumped in with these coal-workers'-

14

pneumoconiosis-minded statutes. It is no surprise that this Court has grappled with these statutes in the past.

KRS 342.315 reads in pertinent part:

(1) The commissioner *shall* contract with the University of Kentucky and the University of Louisville medical schools to evaluate workers who have had injuries or become affected by occupational diseases covered by this chapter. Referral for evaluation *may* be made to one (1) of the medical schools whenever a medical question is at issue.

(2) The physicians and institutions performing evaluations pursuant to this section *shall* render reports encompassing their findings and opinions in the form prescribed by the commissioner. Except as otherwise provided in KRS 342.316, the clinical findings and opinions of the designated evaluator *shall* be afforded presumptive weight by administrative law judges and the burden to overcome such findings and opinions *shall* fall on the opponent of that evidence. When administrative law judges reject the clinical findings and opinions of the designated evaluator, they *shall* specifically state in the order the reasons for rejecting that evidence.

(3) The commissioner or an administrative law judge *may*, upon the application of any party or upon his own motion, direct appointment by the commissioner, pursuant to subsection (1) of this section, of a medical evaluator to make any necessary medical examination of the employee. Such medical evaluator *shall* file with the commissioner within fifteen (15) days after such examination a written report. The medical evaluator appointed may charge a reasonable fee not exceeding fees established by the commissioner for those services.

(Emphasis added.)

Before conducting this *de novo* review, we first consult our principles of statutory construction:

15

> In construing statutes, our goal, of course, is to give effect to the intent of the General Assembly. We derive that intent, if at all possible, from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration. *Osborne v. Commonwealth*, 185 S.W.3d 645 (Ky. 2006). We presume that the General Assembly intended for the statute to be construed as a whole, for all of its parts to have meaning, and for it to harmonize with related statutes. *Hall v. Hospitality Resources, Inc.*, 276 S.W.3d 775 (Ky. 2008); *Lewis v. Jackson Energy Cooperative Corporation*, 189 S.W.3d 87 (Ky. 2005). We also presume that the General Assembly did not intend an absurd statute or an unconstitutional one. *Layne v. Newberg*, 841 S.W.2d 181 (Ky. 1992). Only if the statute is ambiguous or otherwise frustrates a plain reading, do we resort to extrinsic aids such as the statute's legislative history; the canons of construction; or, especially in the case of model or uniform statutes, interpretations by other courts. *MPM Financial Group, Inc. v. Morton*, 289 S.W.3d 193 (Ky. 2009); *Knotts v. Zurich*, 197 S.W.3d 512 (Ky. 2006); *Stephenson v. Woodward*, 182 S.W.3d 162 (Ky. 2005).

*Shawnee Telecom Res., Inc. v. Brown*, 354 S.W.3d 542, 551 (Ky. 2011).

With those guideposts in mind, we turn to the statutes at hand. KRS 342.315(1) uses the mandatory "shall" when it dictates that "[t]he commissioner *shall* contract with the University of Kentucky and the University of Louisville medical schools to evaluate workers who have had injuries or become affected by occupational diseases . . . ." (Emphasis added.) It is clear from the statute that the commissioner is statutorily mandated to contract exclusively with those two universities to provide independent medical evaluations. It is undisputed that the commissioner has fulfilled that obligation and contracted with the universities.

16

However, KRS 342.315(1) uses the permissive "may" when discussing the ALJ referring a claimant for a university evaluation. The final sentence of KRS 342.315(1), reads "[r]eferral for evaluation *may* be made to one (1) of the medical schools whenever a medical question is at issue." The plain language of the statute is contrary to a construction which would require a university evaluation in every case in which a claimant asserts he or she suffers from an occupational disease. Even if construed to be a mandate, the statute imposes only the duty to "refer." Here, the Commissioner did in fact "refer" Miller to the medical schools for a university evaluation—more than once. A university evaluation was simply unavailable. The ALJ was denied this particular tool to assist the fact finder in this case, and he therefore decided the case on the evidence before him.

KRS 342.315(2) states in part that "the clinical findings and opinions of the designated [university] evaluator shall be afforded presumptive weight by administrative law judges and the burden to overcome such findings and opinions shall fall on the opponent of that evidence." Again, the mandatory "shall" is used to require that the ALJ awards a rebuttable presumption based on the university evaluation, should an evaluation be performed. If the statutory presumption based on a university evaluation can be overcome by sufficient evidence, then the ALJ's decision in the absence of a university evaluation should likewise be upheld if supported by substantial evidence. In

17

this case, it was impossible to obtain a university evaluation and the ALJ's decision was supported by substantial evidence.

KRS 342.315(3) further supports this permissive construction of the statute. It states "[t]he commissioner or an administrative law judge *may,* upon the application of any party or upon his own motion, direct appointment by the commissioner, pursuant to subsection (1) of this section, of a [university] medical evaluator to make any necessary medical examination of the employee." (Emphasis added.) Again, the legislature uses the permissive term "may" rather than the mandatory "shall." The plain reading of the text makes clear that the ALJ has the *discretion* to order a university evaluation. The legislature mandates that the commissioner contract with these two medical schools to provide ALJs with a source of unbiased medical opinions. Nowhere in the statute does it mandate that the ALJ *must* utilize such an evaluation in deciding each case—much less that the ALJ must do so when the evaluation is unavailable.

The Commissioner fulfilled its statutory obligation to contract with the two schools.

In this case, we know that Miller suffered from bladder cancer. We also know from the evidence that a condition existed at TEMA which could cause such a disease. As such, there was substantial evidence on which the ALJ could base his decision. The ALJ was well within his discretion to decide this

18

case when repeated efforts to obtain a university evaluation were unsuccessful. Such an evaluation would have awarded one of the parties a favorable presumption under 342.315(2). The favorable presumption, however is not determinative of the case. The ALJ is within his discretion to rule for the other party as long as he specifies his reasons for doing so and such ruling is supported by substantial evidence. "When administrative law judges reject the clinical findings and opinions of the designated evaluator, they shall specifically state in the order the reasons for rejecting that evidence." KRS 342.315(2). "KRS 342.315(2) does not prohibit the fact-finder from rejecting a finding or opinion of a university evaluator but requires only that the reasons for doing so must be specifically stated." *Magic Coal Co. v. Fox*, 19 S.W.3d 88, 94–95 (Ky. 2000). The fact that the presumption can be overcome and is not dispositive of the case clearly demonstrates that a claim can be decided on evidence that contradicts a university evaluation. Therefore, a case can also be decided on the evidence if the ALJ is unable to obtain such an evaluation.

We now turn to the applicable administrative regulations. 803 KAR 25:010(6), as it existed at the time, stated: "For all occupational disease . . . claims, the [commissioner] *shall* promptly schedule an examination pursuant to KRS 342.315 and 342.316."[2] (Emphasis added.) Further, 803 KAR

---

[2] The regulation in question has since been amended and this subsection removed.

19

25:010(11) stated, "[a]ll persons claiming benefits for . . . occupational disease *shall* be referred by the [commissioner] for a medical evaluation in accordance with contracts entered into between the commissioner and the University of Kentucky and University of Louisville medical schools." (Emphasis added.) KAR 25:010(11) creates an additional requirement than that in the statute— exchanging the permissive "may" of KRS 342.315 to a mandatory "shall." However, even if we were to follow the mandatory language of the regulations in conducting our analysis, the result is the same, as the mandate was followed here. The regulation required the commissioner to refer Miller for a medical evaluation and to schedule an appointment. The commissioner did refer Miller and did attempt to schedule said appointment on multiple occasions.

KAR 25:010(11) states that the claim shall be referred, not that the claim is barred if the universities are unable to provide an evaluation. Since the ALJ may reject the opinion of the university evaluator and rely instead on other evidence, *Magic Coal Co.,* 19 S.W.3d at 94–95, it stands to reason that, in the absence of a university evaluation, there may be sufficient evidence from other sources.

Here, the commissioner attempted to get a university evaluation and none was available. It would be nonsensical to turn a party away from pursuing a claim because he was unable to obtain a university evaluation. Miller had no control over whether the university evaluators chose to take his

20

case—and this Court will not punish him for the fact that it was impossible for him to obtain such an evaluation.

## IV. CONCLUSION

For the foregoing reasons, we reverse the Court of Appeals and reinstate the ALJ's opinion and award.

All sitting. All concur.


COUNSEL FOR APPELLANT:

Charles William Gorham
The Law Office of Charles W. Gorham


COUNSEL FOR APPELLEE TEMA ISENMANN, INC.:

Carl Martin Brashear
Hoskins Law Offices, PLLC