# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: APRIL 27, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0542-WC
2021-SC-0547-WC

LARRY DIXIE        APPELLANT/CROSS-APPELLEE

V.

ON APPEAL FROM COURT OF APPEALS
NO. 2021-CA-0786, 2021-CA-0941
WORKERS' COMPENSTATION BOARD NOS.
WC-15-93846, WC-17-72355,
WC-18-01768

FORD MOTOR COMPANY;        APPELLEES/CROSS-APPELLANTS
HONORABLE W. GREG HARVEY,
ADMNISTRATIVE LAW JUDGE;
DR. MARK SMITH; AND KENTUCKY
WORKERS' COMPENSATION BOARD

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING AND REMANDING

Larry Dixie (Dixie) appeals from a Court of Appeals decision which affirmed a ruling of the Workers' Compensation Board (the Board). The Board affirmed in part and reversed in part the administrative law judge's (ALJ) opinion and order. The Board reversed and remanded solely on the issue of Dixie's entitlement to temporary total disability (TTD) benefits during periods he returned to light duty work. The Court of Appeals fully affirmed the Board.[1]

---

[1] *Dixie v. Ford Motor Co.*, 2021-CA-0786-WC, 2021 WL 4929419 (Ky. App. Oct. 22, 2021).

Dixie first challenges dismissal of his neck injury as non-work related. In addition, while Dixie concedes that the Board was correct in remanding this case to the ALJ for a more detailed analysis regarding Dixie's entitlement to TTD benefits under *Trane Commercial Systems v. Tipton*,[2] he asserts that Ford Motor Company (Ford) failed to properly preserve the issue of its entitlement to credits against owed TTD benefits for wages it paid to Dixie and for unemployment benefits Dixie received. Ford argues on cross-appeal that the ALJ's application of the three-multiplier contained in KRS[3] 342.730(1)(c) to Dixie's permanent partial disability (PPD) benefits was error. After review, we affirm.

## I.    FACTS AND PROCEDURAL BACKGROUND

At the time of the hearing before the ALJ in August 2020, Dixie was a forty-eight-year-old high school graduate. Prior to his employment with Ford, Dixie worked as a warehouse laborer and as a sales representative for a carpet cleaning company in addition to various temporary employments. He began working for Ford on April 28, 2014. He alleged that he sustained distinct injuries to his right shoulder, left shoulder, and cervical spine/neck caused by his work for Ford.

The first injury, to Dixie's right shoulder, occurred on September 9, 2014. Dixie's job in the factory at that time was to repeatedly load parts weighing between forty-five and fifty-five pounds onto a rack with a top and

---

[2] 481 S.W.3d 800 (Ky. 2016).

[3] Kentucky Revised Statute.

bottom shelf. To get the parts onto the outer portion of the top shelf, Dixie had to raise the part overhead, step onto the rack, and lean his body forward. As he was doing this on September 9, 2014, he felt pain in his shoulder. Dixie began treating with an orthopedic specialist, Dr. Mark Smith (Dr. Smith), after more conservative treatments failed to help. When an MRI revealed Dixie had a rotator cuff tear, Dr. Smith performed a rotator cuff repair and clavicle resection on January 29, 2015. After a six-week recovery period during which Dixie did not work at all, he returned to work with light duty restrictions.

After Dixie returned to light duty, he continued to experience pain and decreased function in his right shoulder. Dr. Smith would eventually discover a second rotator cuff tear in Dixie's right shoulder for which he underwent an arthroscopic rotator cuff repair on October 6, 2015. Dixie again had a six-week recovery period during which he did not work and returned to light duty work at Ford after the recovery period was over. However, his right shoulder still did not heal correctly, and a third and final right shoulder surgery was performed on September 8, 2016. He had a third six-week recovery period after which he was returned to light duty.

Dixie's second injury, this time to his left shoulder, occurred on July 14, 2017. At that time, Dixie's job was to inspect wheel rims that weighed about forty-five pounds each. If a rim was defective, Dixie would mark it and remove it from a table and place it on the floor. As he was doing this on the date of the injury, he felt a pop in his left shoulder. He again treated with Dr. Smith who diagnosed a rotator cuff tear in his left shoulder requiring surgical repair that

3

occurred on September 26, 2017.  Six weeks after the surgery, Dixie was returned to light duty work.

Dixie's third and final alleged work injury, to his neck, occurred on June 14, 2018.  Dixie testified that he was working on an assembly line, and his job was to affix bolts to parts using a pneumatic drill.  The drill recoiled, and Dixie felt a popping sensation in his neck that radiated into his shoulders.  He also experienced a "deaf tone" in his ears when the pop occurred.  At first, Dixie saw Dr. Smith for treatment, but Dr. Smith later referred him to a neck specialist, Dr. Aaron Compton (Dr. Compton).  Dr. Compton administered cervical steroid injections without lasting benefit.  Dr. Compton then referred Dixie to his partner, Dr. Vemu Venmuri (Dr. Venmuri), a neurosurgeon who performed a cervical fusion on April 15, 2019.

Following the cervical fusion surgery, Dixie was off work for six weeks and was ultimately placed on permanent medical restrictions, including no repetitive use of his upper extremities, no lifting more than ten pounds, and no repetitive movement of his neck from side to side.  Dixie was never able to return to full time work, and his last day of work at Ford was June 18, 2019.  Dixie began receiving unemployment benefits "a couple of months" before the hearing before the ALJ, which occurred in August 2020.

During Dixie's periods of light duty work following each of his surgeries, he continued to be paid his regular wages.  However, most of his time was spent sitting at a picnic table until Ford could assign him a task within his restrictions, for example, sweeping the floors or installing screws on small

4

parts. He was often sent home early because Ford was unable to assign him a task within his medical restrictions.

Dixie continues to experience ongoing pain and burning in his neck and bilateral shoulders as well as radiating pain and numbness into his fingers. This pain interferes with his tasks of daily living such as finding a comfortable position to sleep in, putting dishes away, and playing baseball with his son. He testified before the ALJ that he believes he is physically incapable of returning to his previous work with Ford, and that he is permanently and totally disabled.

Dixie filed a Form 101 following each of his injuries and his claims were consolidated. Ford did not dispute the compensability of Dixie's right shoulder injury,[4] but it contested the compensability of the left shoulder and neck injuries and filed medical fee disputes regarding treatment for the same. The ALJ found that Dixie's neck injury was not work related, but that his left shoulder injury was. The ALJ assigned an 8% whole person impairment rating for his left shoulder. The ALJ disagreed with Dixie's contention that he was permanently and totally disabled. However, the ALJ awarded PPD benefits and applied the three-multiplier provided for in KRS 342.730(c)1. based on its belief that Dixie was physically unable to return to the type of work he performed prior to his shoulder injuries. The ALJ awarded PPD benefits for Dixie's right shoulder as follows: ($432.41 x .09 x .85 x 3 = $99.24 per week for 425 weeks),

---

[4] The ALJ assigned Dixie a 9% whole person impairment rating for Dixie's right shoulder.

and for Dixie's left shoulder as follows: ($437.82 x .08 x .85 x 3 = $89.32 per week for 425 weeks).

It was stipulated that Ford paid voluntary TTD benefits for Dixie's right shoulder injury from January 4, 2016, through March 27, 2016, and again from July 20, 2016, through April 10, 2017, at a rate of $432.41 per week. However, as Ford challenged the compensability of Dixie's left shoulder injury, no TTD benefits were paid for that injury. The ALJ found that Dixie was entitled to additional TTD benefits for his right shoulder from January 25, 2015, through the date of his left shoulder operation on September 26, 2017, and that Ford was "entitled to a credit both for TTD already paid and for wages paid in accordance with KRS 342.730." The ALJ also found that Dixie was entitled to TTD payments for his left shoulder from September 26, 2017, until May 9, 2018, the date of his maximum medical improvement (MMI). The ALJ again ruled that Ford was "entitled to a credit for wages paid in accordance with KRS 342.730(7)."

As for Dixie's neck injury, the ALJ found that it was not work related but was instead due to a pre-existing, active degenerative disk disease. The ALJ based this conclusion on Dr. Smith's medical records and an independent medical examination (IME) conducted by Dr. Thomas Loeb (Dr. Loeb). According to Dr. Smith's records, on June 8, 2018, six days before Dixie's work incident, Dixie reported having neck and radicular arm pain. Dr. Smith ordered an MRI to be conducted on the same day. On June 13, the day before the alleged work injury, Dixie was again seen by Dr. Smith to review his MRI

6

results.  Dr. Smith's treatment notes indicated that Dixie was having significant pain about the cervical spine and reported radicular symptoms that day.  Based on the MRI, Dr. Smith diagnosed Dixie with cervical degenerative disk disease and recommended epidural injections and therapy.  Additionally, on July 18, 2018, about a month after the alleged work injury, Dixie was seen by Dr. Smith but the treatment notes contain no mention of the workplace accident.

Dr. Loeb relied on Dr. Smith's treatment records in reaching his conclusion that Dixie had a pre-existing, active, degenerative disk disease, and that his condition was not caused by the June 14, 2018, work incident.  Dr. Loeb further opined that Dixie's neck had a 5% impairment rating prior to the June 14 work incident.  The ALJ found Dr. Loeb's opinion on causation to be persuasive and dismissed Dixie's neck injury as non-work related.

Both parties filed a petition for reconsideration.  Of relevance, Dixie asserted that the ALJ's dismissal of his neck claim was error, while Ford argued that it was error to apply the three-multiplier to Dixie's PPD benefits.  In addition, Ford argued that the ALJ's TTD award for both the right shoulder and left shoulder were flawed.  Regarding the right shoulder, Ford argued it was error to award TTD benefits for the right shoulder injury from January 25, 2015, through September 26, 2017, because Dr. Smith testified that Dixie reached MMI for his right shoulder injury on June 23, 2017, and that TTD benefits should have been terminated for the right shoulder as of that date.  Further, Ford claimed that its wage records demonstrated Dixie returned to

7

work from July 19, 2015, through October 4, 2015; was off work for his second right shoulder surgery from October 11, 2015, though March 27, 2016; and returned to work again from April 3, 2016, through July 3, 2016. Ford argued that TTD benefits should not have been awarded for the dates that Dixie returned to work.

Ford further argued that the TTD award for the left shoulder from September 26, 2017, (the date of his left shoulder surgery) through May 9, 2018, (the date Dr. Loeb placed him at MMI) was improper because its wage records showed Dixie returned to work and began earning wages on April 8, 2018. It contended TTD benefits should have therefore ceased on April 8, 2018.

Ford also requested that the opinion and order be amended to find that it was entitled to credits against its TTD obligation for: the TTD amounts it had already paid, for all wages paid, and for any unemployment benefits Dixie received.

The ALJ overruled Dixie's argument regarding his neck injury. The ALJ also overruled Ford's assertions regarding the three-multiplier and overruled its arguments regarding TTD being improperly awarded for the right shoulder from January 25, 2015, to September 26, 2017. The ALJ did not address Ford's argument regarding TTD benefits for the left shoulder. However, it modified its opinion "to specifically state that [Ford] is entitled to a credit for TTD paid against all past due benefits awarded," and "to find that [Ford] is entitled to a

credit for all wages paid and unemployment benefits Dixie received[.]" Both

parties appealed to the Board.

Before the Board, the parties asserted the same arguments raised in

their respective petitions for reconsideration before the ALJ. The Board

affirmed the ALJ's dismissal of Dixie's neck claim, and its application of the

three-multiplier, as both rulings were supported by substantial evidence. But

the Board vacated "the ALJ's determination regarding entitlement to TTD

benefits for both the right and left shoulder conditions, and [remanded] for

additional findings of fact." The Board reasoned that in accordance with this

Court's ruling in *Livingood v. Transfreight, LLC*,[5] workers who have not yet

reached MMI that return to work after an injury but are unable to perform

their customary work are not automatically entitled to TTD benefits.[6] Rather,

in accordance with *Trane Commercial*,

> absent extraordinary circumstances, an award of TTD benefits is
> inappropriate if an injured employee has been released to return to
> customary employment, i.e., work within her physical restrictions
> and for which she has the experience, training, and education; and
> the employee has actually returned to employment. . . . [I]n making
> any such award, an ALJ must take into consideration the purpose
> for paying income benefits and set forth specific evidence-based
> reasons why an award of TTD benefits in addition to the
> employee's wages would forward that purpose.[7]

---

[5] 467 S.W.3d 249, 254 (Ky. 2015) ("[*Central Kentucky Steel v. Wise*, 19 S.W.3d 657 (Ky. 2000)] does not 'stand for the principle that workers who are unable to perform their customary work after an injury are always entitled to TTD.'").

[6] *See* KRS 342.0011(11)(a) ("'Temporary total disability' means the condition of an employee who has not reached maximum medical improvement from an injury and has not reached a level of improvement that would permit a return to employment[.]").

[7] *Trane Commercial*, 481 S.W.3d at 807.

9

The Board held that the "ALJ did not provide an adequate analysis concerning entitlement to TTD benefits for either the right or left shoulder injuries," and directed that the ALJ conduct an adequate analysis to justify an award of TTD benefits for the periods that Dixie returned to light duty work on remand. Both parties then appealed to the Court of Appeals.

The Court of Appeals affirmed the Board in full.[8] The Court of Appeals agreed that the ALJ's dismissal of Dixie's neck injury and its application of the three-multiplier were supported by substantial evidence.[9] In response to Dixie's argument that Ford had failed to preserve the issue of its entitlement to credits against any award of TTD benefits, the court held:

> Ford argues that the issue of credits attributable to Ford falls under the issue of TTD benefits, as that was the context in which the Board addressed the issue of credits. We find this argument persuasive. The core issues before the ALJ and the Board centered on Appellant's entitlement, if any, to an award of workers' compensation benefits pursuant to KRS Chapter 342. A fair and accurate calculation of those benefits necessarily required a consideration of credit for wages and benefits already paid. As such, the underlying issue of credits is subsumed in the larger context of calculating KRS Chapter 342 benefits.[10]

The court went on to state that even assuming arguendo that the issue was not properly preserved, it was tried by consent of the parties in accordance with

---

[8] *Dixie*, 2021 WL 4929419, at *5.

[9] *Id.* at *4-*5.

[10] *Id.* at *4.

10

*Nucor Corp. v. General Electric, Co.*[11].[12]  The parties thereafter appealed to this

Court.

Additional facts are discussed below as necessary.

## II.    ANALYSIS

### A. Standard of Review

An ALJ's rulings are entitled to a great deal of deference by an appellate

court.  The oft stated and well-established standard of review is that

> [t]he ALJ has the sole discretion to determine the quality,
> character, and substance of the evidence and may reject any
> testimony and believe or disbelieve various parts of the evidence
> regardless of whether it comes from the same witness or the same
> party's total proof.  On appellate review, the issue is whether
> substantial evidence of probative value supports the ALJ's
> findings.  The ALJ's findings of fact are entitled to considerable
> deference and will not be set aside unless the evidence compels a
> contrary finding. . . . [An Appellant] must establish on appeal that
> the favorable evidence was so overwhelming as to compel a finding
> in his favor.  Evidence that would have supported but not
> compelled a different decision is an inadequate basis for reversal
> on appeal.[13]

With this standard in mind, we now address Dixie's arguments that the ALJ

erred by dismissing his neck injury claim as non-work related and that Ford

failed to preserve the issue of its entitlement to credits for wages paid and for

any unemployment benefits Dixie received.  We will then address Ford's cross-

---

[11] 812 S.W.2d 136, 145 (Ky. 1991) (holding that "if issues not raised by the pleadings are tried by express or implied consent, they shall be treated as if they had been so raised.").

[12] *Dixie*, 2021 WL 4929419, at *4.

[13] *Wilkerson v. Kimball Int'l, Inc.*, 585 S.W.3d 231, 235–36 (Ky. 2019) (internal citations and quotation marks omitted).  The quoted language established the standard of review when the ALJ finds against the party having the burden of proof. *Gray v. Trimmaster*, 173 S.W.3d 236, 241 (Ky. 2005).

appeal argument that the ALJ erred by applying the three-multiplier to Dixie's PPD benefits.

## B. Substantial evidence supported the ALJ's dismissal of Dixie's neck injury.

Dixie contends that the ALJ erred by dismissing his neck claim and that a contrary conclusion is compelled by the evidence. In support, he asserts that he has consistently testified that he believed the June 14, 2018, work incident was the cause of his neck pain and that there is no other injury to his neck of record. Dixie argues that the ALJ misinterpreted and misapplied Dr. Loeb's opinion because his cervical arthritic changes were dormant and asymptomatic leading up to his injury, and Dr. Loeb stated during his deposition that Dixie suffered from an asymptomatic, dormant condition based upon his medical records. Dixie asserts it was accordingly reversible error for the ALJ to find that his pre-existing condition was active. He argues he had no symptoms and that his condition was not AMA ratable immediately preceding the work injury.

As discussed, the ALJ reached their conclusion that Dixie's neck injury was not work related by relying on Dr. Smith's treatment records and Dr. Loeb's opinion on causation. Dr. Smith's treatment records state he saw Dixie six days before his alleged work injury. During that visit, Dixie complained of neck and radicular arm pain resulting in an MRI being performed on the same day. And, one day before the alleged work injury, Dixie again saw Dr. Smith and reported "quite a bit of pain about the cervical spine." Based on the MRI results, Dr. Smith diagnosed Dixie with cervical degenerative disk disease. The ALJ found this evidence contradicted Dixie's argument that there was no factor

12

other than the work incident that caused his cervical spine pain as well as his testimony that he never experienced any neck issues prior to the workplace incident.

The ALJ rejected the conclusions of Dixie's expert Dr. Jules Barefoot (Dr. Barefoot) because "there was no discussion by Dr. Barefoot of the week prior to the alleged injury date, Dixie's complaint of neck and radicular pain and the cervical MRI." The ALJ therefore "[did] not find Dr. Barefoot's opinion on causation as persuasive as [it] might otherwise be." In contrast, the ALJ discussed that "Dr. Loeb did address the facts as evidenced by the treatment records" and that "[t]hose facts caused Dr. Loeb to opine Dixie had pre-existing degenerative changes in the cervical spine that had become active and resulted in Dixie reporting them on June 8, 2018." The ALJ further found that "[t]he MRI depicted the pathology that resulted in the cervical fusion and was present in advance of the June 14, 2018, operation of the pneumatic drill."

Accordingly, we hold that the ALJ's conclusion that Dixie's neck injury was not work related and was instead due to a degenerative disk disease that became active prior to the alleged workplace injury was supported by "evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men."[14] We further hold that Dixie has not cited any evidence on appeal that would compel a finding in his favor. His claim that the only cause of his neck issues contained in the record was the

---

[14] *See, e.g.*, *Miller v. Tema Isenmann, Inc.*, 542 S.W.3d 265, 270 (Ky. 2018) (defining "substantial evidence").

workplace incident is clearly contradicted by Dr. Smith's treatment records. Dr. Smith's records state that he complained of both neck and radicular arm pain six days prior to and one day prior to the workplace incident, and that he had a degenerative disk disease which became active prior to the workplace incident, causing said neck and radicular arm pain. And, although he alleges his neck was not AMA ratable prior to the workplace incident, Dr. Loeb assigned his neck condition a 5% impairment rating before the incident occurred.

The record also clearly refutes Dixie's contention that the ALJ misinterpreted and misapplied Dr. Loeb's conclusions because Dr. Loeb testified in his deposition that Dixie suffered from an asymptomatic, dormant condition. In reviewing Dr. Loeb's deposition, this Court does not interpret his testimony in this way, and Dixie has not pointed us to the specific portion of his testimony to which he refers. At any rate, Dr. Loeb's IME report makes it abundantly clear he believed the condition to be pre-existing and active. His IME states that his diagnosis of Dixie's cervical spine condition was a "longstanding pre-existing degenerative changes at C5-6 which appeared to be an active condition," and that Dixie has had "longstanding active pre-existing degenerative changes in his cervical spine." Dr. Loeb further opined that "100% of the pathology found at C5-6 is due to a longstanding active pre-existing condition with no relationship to the work injury itself."

We accordingly affirm the ALJ's finding that Dixie's neck injury was not work related.

14

**C. Ford properly preserved the issue of its entitlement to credits for both wages paid to and unemployment benefits received by Dixie.**

Dixie next contends that Ford failed to preserve the issue of its entitlement to credits for wages he was paid and for unemployment benefits he received. He alleges that Ford raised the credit issue for the first time on appeal to the Board. The record clearly refutes this argument.

First, regarding its entitlement to credits for wages paid to Dixie to offset any TTD award, Ford's brief to the ALJ states:

> [Ford] is entitled to an offset for any period of TTD awarded while [Dixie] was receiving wages pursuant to KRS 342.730(7).[15] [Dixie's] counsel has never provided the dates for which he is seeking temporary total disability benefits. Once [Dixie] has done so in his brief, and if TTD is awarded, Ford will produce after-tax wages.

And the ALJ explicitly found in its opinion and order that "[Ford] is entitled to a credit for wages paid in accordance with KRS 342.730(7)" for the right shoulder and left shoulder injuries.

Next, concerning Ford's entitlement to credits for any unemployment benefits received by Dixie, Ford was apparently unaware that Dixie was receiving unemployment benefits until the hearing before the ALJ and raised it as an issue as soon as it became aware. Dixie's counsel did not object to Ford's entitlement to a credit for unemployment benefits, and in fact agreed

---

[15] KRS 342.730(7)("Income benefits otherwise payable pursuant to this chapter for temporary total disability during the period the employee has returned to a light-duty or other alternative job position shall be offset by an amount equal to the employee's gross income minus applicable taxes during the period of light-duty work or work in an alternative job position.").

15

that it was so entitled.  The following excerpt from the hearing is

demonstrative:

> MS. HART:[16] Your honor, one other thing.  I would like to add as an issue a credit for unemployment benefits.  I didn't know until today that those had been received.  They weren't being received until very recently.
>
> MR. JENNINGS:[17] I've got—Judge, **I've got no objection.  The statute provides for that**—
>
> THE COURT: I am—
>
> MR. JENNINGS: —**whether its raised or not**.
>
> THE COURT: I'm glad that was brought up.  I made a note to myself about that and we will consider the credit for unemployment benefits to be an issue to address.  . . . I'll kind of leave that record open for that in hopes that you guys can figure that out and stipulate to it.  And otherwise, please file whatever records you have.  As I said, my concern is getting it to be accurate.
>
> MS. HART: Right.  And on that note, I think it would be easiest for Mr. Dixie to probably obtain those records.  And I would ask that plaintiff obtain those records so that we can stipulate to an amount.
>
> MR. JENNINGS: Judge, we don't—we don't mind trying to do that but it is—it is a real mess over there with unemployment right now.  And what I would like to represent to you, we did this in a day—in a case the other day talking about this is that **generically, they're entitled to the credit**.  And even though we can't get this within ten days or two months, that **I would suspect that the standard award provision would provide that they have a credit**.  And we at that particular point in time, whether it's 30 days from now or 60 days from now, we can get that worked out.[18]

---

[16] Counsel for Ford.

[17] Counsel for Dixie.

[18] (Emphasis added).

16

Dixie's counsel filed Dixie's unemployment records into the record a little over a month after the hearing on September 30, 2020.

Consequently, this Court fails to discern how either of these issues were unpreserved. And, at any rate, we agree with the Court of Appeals' reasoning that "[a] fair and accurate calculation of [TTD] benefits necessarily required a consideration of credit for wages and benefits already paid," and "[a]s such, the underlying issue of credits is subsumed in the larger context of calculating KRS 342 benefits."[19] We accordingly affirm, and need not address whether these issues were tried by consent of the parties under *Nucor*.

## D. Substantial evidence supported the ALJ's application of the three-multiplier to Dixie's PPD benefits.

In its cross-appeal, Ford alleges that the ALJ's decision to apply the statutory three-multiplier to Dixie's PPD benefits was not supported by substantial evidence. KRS 342.730(1)(c)1. provides:

> If, due to an injury, an employee does not retain the physical
> capacity to return to the type of work that the employee performed
> at the time of injury, the benefit for permanent partial disability
> shall be multiplied by three (3) times the amount otherwise
> determined under paragraph (b) of this subsection, but this
> provision shall not be construed so as to extend the duration of
> payments[.]

The ALJ found that Dixie did not retain the physical capacity to return to his pre-injury work because of his right and left shoulder injuries. The ALJ based this finding on the opinions of Drs. Smith and Loeb, as well as Dr. Andrew DeGruccio (Dr. DeGruccio) who evaluated Dixie at Ford's request on

---

[19] *Dixie*, 2021 WL 4929419 at *4.

September 29, 2015, and February 8, 2017. Dr. DeGruccio opined that Dixie would continue to have ongoing pain in his right shoulder and felt that he should have permanent restrictions including no overhead work and no lifting or pulling anything greater than thirty pounds. Dr. DeGruccio did not believe Dixie would be able to return to his previous occupation.

Similarly, Dr. Loeb believed Dixie should engage in minimal lifting above shoulder level and should engage in no repetitive lifting over chest level with a weight exceeding five pounds. Dr. Loeb was also of the opinion that Dixie could not return to the type of work he was performing at the time of the injury due to his right shoulder and left shoulder injuries. Dr. Smith assigned permanent work restrictions to Dixie that included no overhead lifting on his right or left side, and no lifting more than ten pounds with his individual extremities or twenty pounds combined. Dr. Smith noted that Dixie returning to work for Ford would entirely depend upon Ford's ability to accommodate his permanent restrictions. We hold that the opinions of these three physicians constituted substantial evidence that Dixie could not return to his pre-injury work, and that the ALJ's application of the three-multiplier was therefore supported by substantial evidence.[20]

Notwithstanding, Ford argues that two pieces of evidence compel a finding in its favor, both of which were acknowledged by the ALJ in their

---

[20] *See Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky. 1986) ("When the decision of the fact-finder favors the person with the burden of proof, his only burden on appeal is to show that there was some evidence of substance to support the finding[.]").

18

opinion and order. First, that surveillance footage of Dixie captured by a private investigator showed Dixie lifting his arms overhead with no apparent pain or distress.[21] Second, that Dixie attended barber school from November 2019 to April 2020, five days a week, for eight hours a day. Dixie was in a classroom setting from 8 a.m. to 12 p.m. and would then cut hair in the afternoon. Dixie drove himself to class each day, which was a ninety-minute roundtrip commute. The classes were halted due to the COVID-19 pandemic, and Dixie testified he did not return after classes resumed due to both his physical condition and fear of exposure to COVID.

Ford's argument is insufficient to compel a finding in its favor. The touchstone of KRS 342.730(1)(c)1. is whether the employee is physically capable of returning to "the type of work that the employee performed at the time of the injury[.]" At the time of Dixie's right shoulder injury, his job was repeatedly lifting and loading parts weighing at least forty-five pounds onto a rack, and included lifting those parts overhead. At the time of Dixie's left shoulder injury, he had to lift any defective forty-five-pound parts from a table and put them on the floor. Given the permanent medical restrictions placed upon him by multiple physicians, Dixie would obviously not be able to return to such extremely physically demanding work. The fact that he was seen lifting his hands above his head or that he attended barber school does nothing to

---

[21] The surveillance footage is not part of the record on appeal, though the private investigator's report including several still photographs are.

change his physical inability to return to his pre-injury work. We accordingly affirm the ALJ's application of the three-multiplier to his PPD benefits.

### III.   CONCLUSION

Based on the foregoing, we affirm the Court of Appeals and remand to the ALJ for additional findings as to TTD benefits, including any applicable credits, in accordance with the Board's ruling.

VanMeter, C.J.; Bisig, Conley, Keller, Lambert, and Nickell, JJ.; sitting. All concur. Thompson, J., not sitting.

COUNSEL FOR APPELLANT/CROSS-APPELLEE:

Charles E. Jennings
Jennings Law Office

COUNSEL FOR APPELLEE/CROSS-APPELLANT, FORD MOTOR COMPANY:

George Timothy Todd Kitchen, III
Sewell & Neal, PLLC

APPELLEE:
Mark Smith
Pro Se

COUNSEL FOR APPELLEE, WORKERS' COMPENSATION BOARD:

Michael Wayne Alvey
Chairman

ADMINISTRATIVE LAW JUDGE:
Hon. Walter Gregory Harvey